Clyde **WALKER**, Plaintiff-Appellant, Cross-Appellee,

v.

**FORD MOTOR COMPANY and Northgate Lincoln-Mercury Dealer, Inc., Defendants-Appellees, Cross-Appellants.**

No. 81–5445.

United States Court of Appeals, Eleventh Circuit.

Sept. 7, 1982.

---

Joseph R. Moss, Cocoa, Fla., for plaintiff-appellant, cross-appellee.

William E. Sizemore, Tampa, Fla., Thomas M. Gonzalez, Tampa, Fla., for defendants-appellees, cross-appellants.

Before TUTTLE, KRAVITCH and HENDERSON, Circuit Judges.

KRAVITCH, Circuit Judge.

In this Title VII case, both Clyde Walker and Ford Motor Company appeal from a judgment entered for Walker after a bench trial. Walker contends that the trial court erred in not awarding him sufficient back-

pay and in not permitting him to recover compensatory and punitive damages; Ford asserts that the trial court improperly found that it violated Title VII. Finding no error below, we affirm.

## I.

Appellant Walker is a black man who in 1975 entered a minority dealer training program instituted by Ford and administered through participating local dealerships. During the 18-month training program trainees received a stipend of $1500 per month. Walker was assigned for his training to the Northgate Lincoln-Mercury dealership in Tampa, Florida. He began the program on October 27, 1975, and over the course of the next few months complained to Ford that Northgate management and employees repeatedly used offensive racial epithets, including referring to poorly repaired cars as "nigger-rigged" and referring to the salesman with the lowest sales volume as "the black ass." On one occasion the Northgate leasing manager called Walker a "dumb nigger"; [1] another time, this same employee stated that one of the lease cars had been damaged by "niggers." On still another occasion, when a black man created a disturbance at the dealership, a salesman was instructed to call the police to "get this nigger out of here."

Walker was terminated from the training program on June 17, 1976, four days after a Northgate co-owner Parks incorrectly reported Walker absent from work and shortly after Walker had requested a transfer to another dealership because of the racial slurs used by Northgate personnel. Walker sought reinstatement from Ford, and when it refused, filed a complaint with the EEOC. After receiving his right-to-sue letter, Walker filed this action in federal district court, alleging that the termination violated Title VII. The district court found that the pervasive use of racial slurs at the Northgate dealership was an unlawful employment practice under 42 U.S.C. § 2000e–

2(a)(1) and that the inaccurate attendance report which resulted in Walker's discharge was motivated by Walker's complaints about the racial epithets. Accordingly, the court found that Ford and Northgate were guilty of retaliatory discharge under 42 U.S.C. § 2000e–3(a). The court awarded Walker reinstatement in the training program, or alternatively backpay for the remainder of the training period missed by Walker after the discharge, and attorney's fees, but denied compensatory damages claimed by Walker and also denied punitive damages.

## II.

We first address the issues raised by Ford's cross-appeal. Ford makes two separate arguments concerning the trial court's finding that it violated Title VII. First, it claims that while a work atmosphere tainted by pervasive racially abusive language can be unlawful under § 2000e–2, the racial slurs used at the Northgate dealership were not sufficiently pervasive to rise to a violation of Title VII.

We disagree. As Ford correctly notes, "an employer violates Title VII simply by creating or condoning an environment at the workplace which significantly and adversely affects [the psychological well-being of] an employee because of his race or ethnicity, regardless of any other tangible job detriment to the employee." *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982). *See Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *Calcote v. Texas Education Foundation, Inc.*, 458 F.Supp. 231, 237 (W.D.Tex.1976), *aff'd*, 578 F.2d 95 (5th Cir. 1978). *Accord Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981); *Cariddi v. Kansas Chiefs Football Club*, 568 F.2d 87, 88 (8th Cir. 1978). Ford argues, however, that the racial slurs used by Northgate personnel were either common parlance of an automo-

---

**1.** The circumstances surrounding this incident were disputed at trial. Walker claimed that the incident occurred when the Northgate employee spilled coffee on himself after bumping into a door that Walker had left locked. The em-

ployee claimed that he and Walker fought over $20 Walker allegedly owed him. The parties do not dispute that the employee later apologized to Walker.

bile dealership (i.e., "nigger-rigged") or else were sporadic references and in most instances not aimed at Walker.

This court recognized in *Henson* that "the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee 'does not rise to a Title VII violation.' For [ ] harassment to state a claim under Title VII, it must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson*, 682 F.2d at 904. Here, however, the district court specifically found that Northgate personnel's use of the terms "nigger-rigged" and "black-ass," as well as other racially abusive language was "repeated," "continuous," and "prolonged" despite Walker's objections, and that the language made Walker feel unwanted and uncomfortable in his surroundings. These findings were findings of fact which must be upheld unless clearly erroneous. *See id.* at 907–07 (whether harassment is severe enough to seriously affect the psychological well-being of employees is a question to be determined with regard to the totality of the circumstances).

 The findings were not clearly erroneous. Co-owner Karras admitted to repeatedly using the term "black ass." Although Parks claimed he had never heard the phrase "nigger-rigged" around the dealership, he admitted it was a common term in the car business. Both men asserted, however, that neither of these terms were intended to carry racial overtones. All other instances of opprobrious language alleged by Walker were confirmed by the record, and even Judson Powell, the manager of Ford's trainee program, tacitly admitted the conditions at the Northgate

dealership by advising Walker that the racial slurs were "just something a black man would have to deal with in the South," and that Walker should not dwell on "trivialities" but concentrate on the broad goal of finishing the training program. Accordingly, we find no error in the court's conclusion that the work atmosphere at the Northgate dealership violated § 2000e–2.[2]

Ford's next argument is that even if the trial court was correct in finding a § 2000e–2 violation, it erred in finding a retaliatory discharge under § 2000e–3. Ford contends that the trial court impermissibly shifted the burden of proof to Ford to show a legitimate non-discriminatory reason for the discharge contrary to the Supreme Court decision in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Further, Ford asserts that no evidence of a retaliatory discharge existed to support the trial court's findings.

 We find both these arguments without merit. As to the first, we agree with Ford that *Burdine* mandates that the plaintiff always bear the burden of persuasion on the ultimate fact of discrimination. We also agree that under the traditional three-step proof in Title VII cases,[3] once a plaintiff carries his prima facie case, the employer must only articulate, not prove by a preponderance, a legitimate nondiscriminatory reason for the discharge. *See Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095; *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir. 1982). We do not agree, however, that the court applied the incorrect burden of proof to Ford. Although the district court's findings did not

---

**2.** The fact that many of the epithets were not directed at Walker is not determinative. The offensive language often was used in Walker's presence after he had voiced objections to Ford. Accordingly, we find that under the circumstances Northgate's conduct "creat[ed] a working environment heavily charged with ethnic or racial discrimination." *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

**3.** This three-step process requires a plaintiff to prove certain facts making out a prima facie

case, after which the defendant must articulate a legitimate nondiscriminatory reason for the adverse employment action. If the defendant does so, the plaintiff must prove the proffered reason is pretextual. *See Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095; *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, at 101 (11th Cir. 1982). To make out a prima facie case of retaliatory discharge, the plaintiff must show (1) a protected activity, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action. *Id.*

clearly delineate the various steps in the proof of a Title VII claim, the transcript makes clear that the judge examined the pertinent facts and applied the proper burden of proof to the ultimate finding of discrimination.[4] As the former Fifth Circuit has held, the absence of the labels "prima facie case" and "pretextual" in the trial court's findings is not fatal to the plaintiff's claim as long as the plaintiff proves under the correct allocation of the burden of proof the ultimate fact of intentional discrimination.[5] *E.g., Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1071 (5th Cir. 1981); *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1166 (5th Cir. 1980).

■ Ford's second claim is likewise meritless. The court found after reviewing all the evidence that "a significant motivation" for Walker's discharge was his complaints about the racial slurs at the Northgate dealership. This finding of ultimate fact can be overturned only if clearly erroneous. *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 1787–91, 72 L.Ed.2d 66 (1982); *Jones v. Lumberjack Meats, Inc., supra* at 101. The trial court's finding was amply supported by the record. Walker's discharge resulted from co-owner Parks' report to Ford that Walker had been absent from work without excuse and Parks' request that Walker be removed from the Northgate training program. Parks had signed work reports for Walker indicating that the trainee had attended work on the

disputed day, however, and the incorrect report and request for Walker's removal came shortly after Walker had asked Ford for a transfer because of the racial slurs at Northgate. Ford, moreover, offered Walker no viable explanation for his removal other than that he had "failed to live within the discipline of the dealership" and its proffered excuse at trial—Walker's alleged absenteeism—was rebutted by work reports introduced by Walker. Accordingly, we find no error in the trial court's conclusion that Ford was guilty of retaliatory discharge under 42 U.S.C. § 2000e–3.

### III.

We next turn to the claims raised by Walker concerning the backpay award. He first asserts that the trial court erred in awarding his backpay only from the time of dismissal to the end of the training program. The trial court based its denial of further backpay on the theory that because the training program had a fixed term of eighteen months and because the training agreement specifically relieved Ford of any obligation to employ Walker at the program's end,[6] Walker was entitled only to backpay for the duration of the program. Walker contends that the evidence showed that Ford placed trainee graduates in dealerships or other management positions and therefore he is entitled to backpay until the time of reinstatement. Ford disputes

---

4. The transcript reveals the Court's awareness of the correct burden of proof. At one point during final argument, for example, the following colloquy between the court and counsel occurred:

> THE COURT: All right. That will be fine. There is one question which I would like to address to you and it is rather difficult to know how to put it precisely, but I would like to ask whether or not you agree that in order for the Plaintiff to recover in this case he must show that he was discharged or terminated by Ford either because of his race or because he objected to racial conditions at the dealership.
> Do you agree with that?
> MR. MOSS: Yes, sir. (T–286 –287).

Shortly afterward the court again inquired:
> THE COURT: Wouldn't I have to find that he was terminated because of discrimination—
> MR. MOSS: Yes. (T–299).

5. Ford contends that the plaintiff could not have carried his prima facie case of retaliatory discharge because no evidence existed which proved a "causal link" between the discharge and Walker's complaints about the racial epithets. See note 3, *supra*. As we explain in the text, *infra*, however, the evidence, although circumstantial, was ample for the trial court both to have found such a link and to have rejected Ford's proffered explanation for the discharge.

6. The agreement contained the following provision:

> Nothing herein shall be construed as constituting any assurance or promise by Ford Motor Company that you will be offered a job with it or any dealership, or a Ford or Lincoln-Mercury Dealer Sales and Service Agreement, upon the completion of the Dealer Training Program.

Walker's characterization of the evidence and urges that the trial court's ruling was correct.

 Although we find under separate analysis that Walker was not entitled to further backpay, we conclude that the trial court's reasoning was too superficial. The mere fact that the training agreement was for a fixed term did not automatically end Ford's liability. On the contrary, our cases have recognized that even employees hired for fixed terms may be entitled to backpay from the date of the adverse employment action until reinstatement. *See, e.g., McLaurin v. Columbia Municipal Separate School District,* 478 F.2d 348, 356 (5th Cir. 1973) (teachers employed under one-year contracts entitled to backpay from date of discharge to date of reinstatement); *Sparks v. Griffin,* 460 F.2d 433, 443 (5th Cir. 1972) (same).[7] Nevertheless, our cases also hold that a Title VII plaintiff bears the initial burden of establishing the economic injury resulting from the adverse employment action. *See Marks v. Prattco,* 633 F.2d 1122, 1125 (5th Cir. 1981) (once plaintiff in Title VII case establishes prima facie case and damages resulting from discriminatory acts, burden of producing further evidence on damages to establish amount of earnings or lack of diligence in mitigation falls to defendant); *Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1167 (5th Cir. 1980) (court should not award backpay unless wages are properly owed to employee, but if court determines an economic loss was sustained backpay should be awarded unless special circumstances are present); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 259 (5th Cir. 1974), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (in class action discrimination suit employee carries initial burden of showing he is a class member and describing the harmful effect of discrimination on his employment). *Accord Taylor v. Phillips Industries, Inc.,* 593 F.2d 783, 787 (7th Cir. 1979) ("Not until plaintiff establishes what she contends are her damages does the burden of going forward to rebut the damage claim ... fall on the

defendant."). The essential question before us, therefore, is whether Walker has "established damages resulting from the discriminatory acts" of Ford for a period beyond the training program.

An employee's claim for backpay for a period beyond that set by the employment agreement raises issues of causation which have not been thoroughly analyzed by the courts. In cases involving employment terminable at will or otherwise of indefinite duration, courts in essence have presumed that once the plaintiff shows that discrimination resulted in economic injury, either through improper discharge or a failure to hire, the injury continues until reinstatement. *See Merriweather v. Hercules, Inc., supra* (once plaintiff proved injury due to discrimination plaintiff was entitled to backpay until date of reinstatement despite questions concerning plaintiff's health, since record did not show high rate of absenteeism); *Mims v. Wilson,* 514 F.2d 106, 110 (5th Cir. 1975) (plaintiff who proves he is victim of unlawful discrimination presumptively entitled to backpay until date of reinstatement). *See also Edwards v. School Board,* 658 F.2d 951, 954–55 (4th Cir. 1981) (Title VII plaintiff who proves intentional discrimination need not prove continuing property interest in job to recover backpay until reinstatement). This presumption is proper not only because the defendant's wrongful conduct prevents accurately reconstructing the plaintiff's work history but also because in the absence of evidence to the contrary, no reason exists to assume that employment for an indefinite term would not have lasted indefinitely.

 The Fourth Circuit has held this presumption applicable even in cases which involve fixed terms of employment. *Edwards v. School Board, supra.* Unlike situations involving employment of indefinite duration where such a presumption is consistent with the facts of the case, however, applying a presumption of continued employment to fixed-term cases runs contrary to the evidence which, absent anything to

---

**7.** The Eleventh Circuit, in the en banc case *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

the contrary, shows that the employment relationship would have ended as of a set date. Moreover, other courts have not always awarded backpay to the date of reinstatement in cases of fixed-term employment. In *Welch v. University of Texas*, 659 F.2d 531 (5th Cir. Unit A 1981),[8] for example, a female research assistant sued under Title VII on a theory of constructive discharge and requested backpay. The district court found a Title VII violation, but awarded backpay only from the date of discharge to the date of expiration of the grant under which Welch had been hired. On appeal the former Fifth Circuit upheld the backpay award, noting that "it is simply a matter of speculation whether Welch would have been shifted to another grant after [the current grant expired]." *Id.* at 534. *See also Geller v. Markham*, 635 F.2d 1027, 1036 (2d Cir. 1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981) (upholding trial court's refusal to grant reinstatement under theory that jury's damage award equal to one-year's salary amounted to finding that teacher subject to unlawful failure to hire under ADEA was deprived of only one year's employment). Although *Welch* initially appears inconsistent with the teacher-discharge cases cited earlier, a close review of these cases reveals a factual difference we perceive as critical: the teacher cases invariably included evidence that either the particular teacher's limited-term contract had been renewed in prior years or else that the

school system involved typically had renewed teacher contracts. Putting this evidence in the perspective of our more general holdings on Title VII damages, this evidence fulfilled an initial burden concerning the plaintiff's economic loss by showing that absent discrimination a teacher reasonably could expect reemployment despite being hired under a fixed-term contract. Such evidence, in contrast, was lacking in *Welch*, which limited backpay to the proven economic injury—the loss of employment for the remainder of the grant term.

 Generalizing these holdings to a broad rule of Title VII damages, we conclude that the proper allocation of proof in cases involving fixed-term contracts is that a plaintiff must initially introduce some evidence showing that the economic injury resulting from the discharge extended beyond the employment term. As in the teacher discharge cases, this proof may consist of no more than a showing that the particular plaintiff's contract had been renewed in the past, that contracts of similarly situated employees had been renewed, or that the employer had made a promise of continued employment. Once the plaintiff carries this burden, and thus in the words of *Marks v. Prattco, supra*, establishes the damages resulting from the discriminatory acts, then the burden shifts to the defendant to show by a preponderance of the evidence that the plaintiff would not have remained in employment beyond the contract term.[9]

**8.** Because this case was decided by a Unit A panel of the former Fifth Circuit subsequent to October 1, 1981, we do not consider it binding precedent on this court. *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

**9.** We adopt this test from cases such as *Avery v. Homewood City Board of Education*, 634 F.2d 337 (5th Cir. Unit B, 1982) which involve situations in which the plaintiff has already proven discrimination but the defendant contends that even absent the discrimination, the adverse employment action would have occurred. *See also Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *League of United Latin American Citizens v. City of Salinas Fire Dept.*, 654 F.2d 557, 558 (9th Cir. 1981) (once intentional discrimination is shown, plaintiff should be appointed retroactively to position denied unless defendant

shows by clear and convincing evidence that even in the absence of discrimination the applicant would not have been selected for the open position). These cases involve the analogous issue of whether proven discrimination caused the economic injury alleged by the plaintiff, thus raising issues of causation similar to those raised here.

We do not find any inconsistency between the allocation of proof we adopt here and the Supreme Court's decision in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). As the Ninth Circuit noted in *City of Salinas, supra*, *Burdine*'s allocation of intermediate burdens of proof applies only to the initial decision whether intentional discrimination occurred. Where a court already has found intentional discrimination, either by defendant's admission, direct evidence, or through the *Burdine* circumstan-

Applying this test to the case before us, we conclude after examining the record that Walker failed to introduce any evidence that he would have continued employment *with Ford* at the end of the training program. The evidence showed that of 40 trainee graduates, only 11 obtained Ford dealerships, which are independent franchises granted by Ford and not "employment" with Ford. Ford officials did testify that Ford "made efforts" to find trainees management positions, but these efforts were directed at other dealerships, not at Ford itself. The record, moreover, is silent as to the success rate of these efforts. Accordingly, we find no error in the district court's denial of further backpay to Walker.[10]

We also reject Walker's argument that his last three months' pay[11] should not have been deducted from the backpay award because he was in Detroit seeking reinstatement. In *Merriweather v. Hercules, Inc.*, 631 F.2d 1161 (5th Cir. 1980) the court held that "the amount which an employee would otherwise have been entitled to in the absence of the discrimination will be reduced by any earnings acquired during the interim period regardless of the type of work involved." This decision is controlling and is decisive.

## IV.

Walker's final complaints concern the district court's denial of certain compensatory damages claimed by Walker[12] and denial of punitive damages. Although the question whether compensatory and punitive damages may be awarded in Title VII actions has not yet been decided by any controlling precedent of this court,[13] *see Whiting v. Jackson State University*, 616 F.2d 116, 122 n.4 (5th Cir. 1980), all other circuits but one which have addressed the issues have held that neither compensatory nor punitive damages are available in a Title VII suit. *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir. 1982) (neither compensatory nor punitive damages are available); *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1107 (6th Cir. 1981) (compensatory damages not available); *Shah v. Mount Zion Hospital & Medical Center*, 642 F.2d 268, 272 (9th Cir. 1981) (neither punitive nor compensatory damages are available); *Harrington v. Vidalia-Butler Board of Education*, 585 F.2d 192, 194–96 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979) (compensatory damages not available); *Richerson v. Jones*, 551 F.2d 918, 926–28 (3d Cir. 1977) (punitive damages not available); *Pearson v. Western Electric Co.*, 542 F.2d 1150, 1151–52 (10th Cir. 1976) (neither com-

tial evidence analysis, *Burdine* is no longer applicable to subsidiary issues such as damages. In the case before us, we have already held Ford liable for intentional discrimination; the only remaining question is damage causation, a question outside *Burdine's* scope.

Finally, we also consider this test fully compatible with our recent decision in *Pettway v. American Cast Iron Pipe Co.*, 681 F.2d 1259 (11th Cir. 1982) (*Pettway V*). In *Pettway V* a panel of this court held that plaintiffs in a class-action discrimination suit did not have to "prove" specific jobs denied and their qualifications for those jobs in order to be entitled to relief, but rather had only to give a "statement" of the essential facts entitling them to relief. We conclude that this test from *Pettway V* essentially is the same as requiring a Title VII plaintiff claiming economic loss for a period beyond the fixed term of employment to introduce some initial evidence that the economic loss in fact continued beyond the employment term, which then shifts the burden to the defendant to prove by a preponderance that the claimed loss was not the result of the unlawful discrimination.

10. We wish to emphasize that the analysis we have adopted here is applicable only in cases involving fixed-term employment and then only in the narrow category where the plaintiff requests backpay for a period extending beyond the employment term. In cases involving employment at will or other employment of indefinite duration, we see no reason to deviate from a presumption that the plaintiff's economic loss would have continued until reinstatement.

11. Ford paid Walker for 90 days subsequent to his termination.

12. These damages claims included moving expenses to Tampa and then to a new dealership for reinstatement, the loss incurred in the sale of Mrs. Walker's flower shop to facilitate Walker's participation in the training program, and damages for Walker's ruined credit rating.

13. Our precedents have held that both compensatory and punitive damages are available in actions brought under 42 U.S.C. § 1981 and § 1983. *See Whiting v. Jackson State University*, 616 F.2d 116, 122 n.4 (5th Cir. 1980).

pensatory nor punitive damages available); *Russell v. American Tobacco Co.*, 528 F.2d 357, 366 (4th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976) (punitive damages not available); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308–10 (6th Cir. 1975) (punitive damages not available).[14] The reasoning behind these decisions is three-fold. First, the language of the Title VII remedies provision, 42 U.S.C. § 2000e–5(g)[15] limits relief to reinstatement with or without backpay and other equitable relief. Compensatory and punitive damages are legal not equitable remedies, and therefore have been held not authorized by the statute. Second, the courts have noted that the legislative history and language of § 2000e–5(g) suggest that this section is modeled on 29 U.S.C. § 160(c), the provision of the National Labor Relations Act which empowers the NLRB to remedy unfair labor practices, *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 & n.11, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), and that § 160(c) has been interpreted not to permit awards of compensatory and punitive damages. *Har-*

*rington, supra*, 585 F.2d at 196–97; *Richerson, supra*, 551 F.2d at 927; *Pearson, supra*, 542 F.2d 1152.

Perhaps the most persuasive rationale behind the damages ban, however, is the courts' observation that in 1968 Congress enacted the Fair Housing laws which specifically provided for both actual and punitive damages remedies, 42 U.S.C. § 3612, yet four years later when Congress amended § 2000e–5(g) it failed to include any provision for damages. As the Ninth Circuit has noted, "the very detailed provisions of § 2000e–5 almost compel the conclusion that Congress intentionally left out any provision for either general or punitive damages." *Padway v. Palches, supra*, 665 F.2d at 968.

We find the reasoning presented in these cases persuasive and adopt the rule that compensatory and punitive damages are unavailable in Title VII suits. We caution, however, that the compensatory damages ban does not include concomitants of employment such as fringe benefits, pension benefits, or other lost work benefits which at times have been referred to as "damages."[16] As the former Fifth Circuit

---

**14.** The only circuit court case arguably contra is *Williams v. Trans World Airlines*, 660 F.2d 1267 (8th Cir. 1981), in which the court stated that "the award of compensatory damages for humiliation or emotional suffering is an appropriate remedy for deprivation of a constitutional right." *Id.* at 1272. *Williams*, however, included claims under both § 1981 and Title VII, and as we noted above, our precedents would permit compensatory damages under § 1981. Since the Eighth Circuit did not say whether it would permit an award of compensatory damages in a case brought solely under Title VII and did not cite or discuss any of the several circuit cases holding compensatory damages unavailable in Title VII suits, we consider *Williams* ambiguous and of marginal value to our analysis. *But see Fiedler v. Indianhead Truck Lines, Inc.*, 670 F.2d 806, 810 n.3 (8th Cir. 1982) (holding that damages for pain and suffering are unavailable in ADEA cases, but citing *Williams v. TWA* as holding that damages for emotional distress are available in Title VII cases).

Appellant cited *Rosen v. Public Service Electric & Gas Co.*, 477 F.2d 90 (3d Cir. 1973) as supporting an award of compensatory damages in Title VII cases. Although the *Rosen* court referred to an award of back pension benefits as "compensatory damages," the Third Circuit later referred to *Rosen* as a case of "equitable

restitution." *Richerson v. Jones*, 551 F.2d 918, 927 n.13 (3d Cir. 1977). As we note in the text, *infra*, moreover, we consider a restoration of lost work benefits such as pension benefits to be within the equitable remedies available in Title VII cases.

**15.** This section states in relevant part:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

**16.** Courts have rarely been precise in defining whether requested relief in Title VII cases is for "damages" or an equitable remedy. Black's Law Dictionary defines "compensatory damages" as damages "such as will compensate the injured party for the injury sustained and nothing more." While certain types of equitable monetary relief such as backpay or restoration

noted in *Whiting v. Jackson State University, supra,* 616 F.2d at 122 n.2, a district court order restoring such lost benefits is in the nature of an injunction and falls within the equitable relief provisions of § 2000e–5(g). Because none of Walker's claimed damages were benefits of work, however, we affirm the trial court's denial of Walker's compensatory and punitive damage claims.

AFFIRMED.

of other lost work benefits could fit this rather expansive definition, the cases holding that "compensatory damages" are unavailable in Title VII actions uniformly deal with either claims for emotional distress (or pain and suffering) or else requests for damages resulting from the consequences of an adverse employment action, such as a ruined credit rating.

*See, e.g., Pearson v. Western Electric Co.,* 542 F.2d 1150, 1151 (10th Cir. 1976) (plaintiff requesting "compensatory damages" for humiliation and loss of credit rating). Walker's damage claims fall within this latter category, which more correctly is termed "consequential damages."