Annette COX, et al., Plaintiffs,

v.

AMERICAN CAST IRON PIPE COMPANY, Defendant.

Civ. A. No. 74–AR–0469–S.

United States District Court, N.D. Alabama, S.D.

April 30, 1984.

J. Scott Vowell, Richard Meelheim, Beddow, Fullan & Vowell, P.A., Birmingham, Ala., for plaintiffs.

J. Fredric Ingram, J. Patrick Logan, F.A. Flowers, III, Carol H. Wolfe, Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

After decertifying the class, the Court allowed 23 individual plaintiffs to offer evidence against defendant, American Cast Iron Pipe Company (ACIPCO), in support of separate claims. On December 30, 1983, after all plaintiffs had rested, the Court granted motions under Rule 41(b), F.R. Civ.P., against 2 plaintiffs, expressed doubts as to the sufficiency of the proof offered by the 21 remaining plaintiffs but required ACIPCO to proceed with its defense as to the claims of the remaining plaintiffs.

Before looking at the proof peculiar to particular cases, the Court will shorten its opinion by pointing out those contentions and facts which are common to the 21 cases. For the reasons previously stated, these common features do not militate against the earlier decertification of the class.

## COMMON FEATURES

1. All plaintiffs are females and thus members of a group protected from acts of employment discrimination by Title VII. Plaintiffs Cox, Morgan and Pandellis, the only plaintiffs who bring claims under the Equal Pay Act, are in a group protected by that Act.

2. The Court has allowed plaintiffs to be imprecise in pleading their individual complaints. No plaintiff has been required in her pleading to spell out the acts of discriminatory conduct of which she, in particular, complains. Generally the claims were predicted to include the following types of alleged acts of discrimination:

A. Discrimination in initial job assignments;

B. Discrimination in job training;

C. Discrimination in compensation;

D. Discrimination in job transfer;

E. Discrimination in advancement opportunities;

F. Discrimination in bonuses;

G. Discrimination in pensions;

H. Discrimination in maternity leave and medical benefits;

I. Discrimination in other fringe benefits;

J. Sexual harassment.

3. All plaintiffs concede that their claims are *disparate treatment* claims and are not *disparate impact* claims. Thus, the Court is not here dealing with an alleged pattern of conduct by ACIPCO which, although facially neutral, impacts adversely on its female employees. Each of the 21 plaintiffs, in order to recover, must present proof of an action or actions by ACIPCO directed toward her, and which discriminated against her because of her sex.

■ 4. The fact that historically and presently certain job classifications at ACIPCO have a much higher percentage of females in them and certain job classifications have a much higher percentage of males in them does not, in and of itself, prove individual disparate treatment cases for these plaintiffs under Title VII. This fact, however, does suggest that the Court should examine the conflicting evidence as to particular incidents in the light of historic practice and attitude.

5. ACIPCO does not attempt here to articulate, or to interpose as a reason for any particular treatment by ACIPCO of any plaintiff, some business necessity which purports to recognize some difference in the physical abilities of males and females. Instead, ACIPCO's defense to each of the claims is that ACIPCO did not intentionally treat any plaintiff differently from the way it treated any other employee, and that any difference in treatment is either imagined by the particular plaintiff or is based on an honest (sometimes objective, but most times subjective) evaluation of the plaintiff by ACIPCO in comparison with her employee competitors, both male and female.

6. Each claim, particularly those of the two black plaintiffs, are potentially impacted by the final consent decree in *Pettway, et al. v. ACIPCO*, 332 F.Supp. 811, in the United States District Court for the Northern District of Alabama. The problem of reconciling these 21 cases with *Pettway* will be explored briefly, *infra*.

## FINDINGS AS TO CERTAIN TYPES OF CLAIMS

■ Before discussing each individual case, the Court repeats and makes final its tentative finding contained in its order of December 30, 1983, to the effect that there was no convincing proof by any plaintiff of any disparate treatment in discipline, no convincing proof of a violation of Title VII in pregnancy and maternity benefits, and no convincing proof of any sexual harassment as a policy acquiesced in or promoted by ACIPCO. *See Corne v. Bausch & Lomb, Inc.*, 390 F.Supp. 161 (D.Ariz.1975); *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir.1982). Furthermore, a renewed scouring of the record reveals no convincing proof of any disparate treatment, as to any plaintiff, with respect to bonuses, pensions, initial job assignments, fringe benefits, or training opportunities. Having found against plaintiffs, and each of them, as to all issues catalogued in this paragraph, there remains for consideration the various allegations of discrimination in compensation, job transfer and advancement.

## A NON-ISSUE

■ Another idea merits discussion, although it is a non-issue. From an analysis of the testimony of several plaintiffs, a part of what they seem to resent is that ACIPCO has no affirmative action program to prefer nor give a "leg up" to females in various aspects of employment for the purpose of achieving eventual sexual parity. Not only does the original complaint itself not make this claim, but such a complaint, if made, could not rise to the level of legitimacy under Title VII. The Eleventh Circuit recently put such an idea to rest in

*Ferguson v. Veterans Administration,* 723 F.2d 871 (11th Cir.1984), where it said:

> Title VII addresses *discrimination.* Plaintiff contends that her employer's failure to implement its own affirmative action plan, designed for the benefit of women and minorities, translates into a Title VII cause of action by which she is entitled to relief. We hold, however, that absent a showing of discrimination, there is no Title VII cause of action for the failure to implement or utilize an affirmative action program. (emphasis the Eleventh Circuit's.)

723 F.2d at 872.

## THE EFFECT, IF ANY, OF PETTWAY

In *Pettway, et al. v. ACIPCO, supra,* which is a long pending case in this Court involving alleged racial discrimination by ACIPCO, and which has taken several appellate trips, this Court, speaking through the Hon. Seybourn H. Lynne, in a consent decree signed on July 14, 1980, said, *inter alia:*

> ... Defendant American [ACIPCO], its officers, agents, employees, and successors and all persons in concert or participation with it be, and hereby they are, enjoined and restrained from engaging in any acts or practices which have the purpose or effect of discriminating against any individual because of race, religion, *sex,* or national origin ... (emphasis supplied).

> \* \* \* \* \* \*

> American [ACIPCO] shall, consistent with the terms of this Decree, maintain and conduct all policies and practices of promotion, transfer, lay-off, recall, and other conditions of employment in a manner which complies with its obligation under Title VII under the Civil Rights Act of 1964.

> \* \* \* \* \* \*

> Any black employee of American [ACIPCO], who was employed between April 1, 1971 and June 12, 1975, and had completed his probationary period as of June 12, 1975, shall be granted the special privileges provided for in Paragraph 13 of this Decree and shall be considered a member of the affected class as defined in Paragraph 12 of this Decree, if, and only if, it is determined by agreement of the parties or by the Court that he was discriminated against by American [ACIPCO] because of his race.

This decree in *Pettway* proceeded to deal in some detail with the following sometimes difficult and esoteric subjects unique to the situation at ACIPCO, particularly the fact that some employees are salaried and some are hourly:

1. The distinction between seniority rights within departments and seniority rights plant wide;

2. Lines of progression;

3. Excluded jobs;

4. Transfers between departments;

5. Pre-entry and advance entry jobs;

6. Special transfer and promotional rights of affected class members;

7. Promotional and seniority rights of non-affected class members;

8. A grievance procedure for monitoring compliance;

9. An implementation committee.

This Court will not attempt to comment on the potential impact of all aspects of *Pettway* but takes judicial knowledge of the comprehensive and complex decree. Perhaps it would have been better judicial administration for the instant case to have been handled by the judge of this Court to which *Pettway* was and is assigned, but the instant case was routinely assigned to the undersigned just as was *Pettway* to Judge Lynne, and therefore the undersigned undertakes, after consultation with Judge Lynne, to do his best to reconcile his conclusions in this case with the holdings enunciated in *Pettway.*

Two of the female plaintiffs in this case, Waldrop and Terry, are black. This fact immediately raises the question as to whether or not either Waldrop or Terry has received all relief to which she is entitled as a victim of any discriminatory practices

which violate Title VII. Both are members of the affected class in *Pettway*, and therefore both have received relief. If in one case a black female who has been denied a promotion complains about the denial because she is black, and complains in another case because she is a female, and the issue of a discriminatory denial is finally adjudicated in the first case, can she proceed in the other case? This question becomes even more complicated where one case is a class action and the other is not. Also, the affirmative action aspects of the decree in *Pettway* potentially affect adversely the white female employees in this case, who are competing with male employees, both black and white, in the ACIPCO workplace. The 19 white female plaintiffs in this case complain about discrimination in promotion, compensation, transfer, etc. They are obviously competing with black males who, long after the instant case was pending, obtained in *Pettway* certain preferential treatment or so-called "affirmative action" relief. During the trial of this case, different witnesses interpreted the *Pettway* consent decree in different ways, leaving this Court a bit confused as to exactly what impact, if any, *Pettway* should have. In most instances this discussion of *Pettway* will become academic as the individual cases are analyzed.

### THE EQUAL PAY ACT CLAIMS

■ Despite the fact that Equal Pay Act claims and Title VII claims are not identical, the Court will look in the same way at the three Equal Pay Act claims and at the claims of those plaintiffs who, under Title VII, claim disparate treatment in compensation. As previously noted, these cases all claim "disparate treatment". The Court will therefore not spend time discussing "adverse impact" or "the perpetuation of the effects of past discrimination", except as the latter two concepts provide background for the claim of a particular plaintiff that she was paid less than her male counterpart. *See Note, Equal Pay, Comparable Work and Job Evaluation*, 90 Yale L.J. 651 (1981). In these cases, the plaintiffs, in order to prevail, must demonstrate the equality of *jobs*, namely, that the jobs being compared and performed by males and by the female plaintiffs require equal skill, effort and responsibility and are performed under equal working conditions. *Schultz v. Wheaton Glass Co.*, 421 F.2d 259 (3rd Cir.), *cert. den.* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The Eleventh Circuit simply does not subscribe to the "comparable worth" analysis contended for by most of the plaintiffs. *Brennan v. City Stores, Inc.*, 479 F.2d 235 (5th Cir.1973); *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981). Thus, the Court must examine the evidence in the light of the correct burden of proof placed upon each plaintiff who is claiming a differential in pay because of her sex.

### THE OVER-ALL EFFECT OF THE SUIT

The Court now makes final its tentative finding of December 30, 1983, that the breakthrough by females into plant clerical jobs at ACIPCO and the elimination of other vestigial disparate treatment came as a result of the EEOC claims of those plaintiffs who filed such claims and who followed those claims by the filing of this suit. Not only have females achieved access to plant clerical jobs, but the pendency of this suit got ACIPCO's attention to the extent that there is no longer any written or unwritten rule which precludes females from occupying any job. If there is still such a rule it was not proven in this case to exist.

### THE INDIVIDUAL CLAIMS

The Court will now analyze the 21 individual claims of disparate treatment separately, beginning with the three plaintiffs who claim under the Equal Pay Act as well as under Title VII.

*Annette Cox*

■ Annette Cox has been an ACIPCO employee since 1968, when she started in the research department. She filed her EEOC claim in 1972. It was not until 1978 that she actually applied for any transfer

or sought to fill any particular job opening. Her alleged disparity is between her pay and the pay of the male employee or employees with whom she attempts to compare herself prior to 1978. Even if she had met her burden of proof that the jobs were equal, *i.e.*, that they require equal skill, effort and responsibility, and were performed under similar working conditions, she cannot prevail under Title VII when she did not offer substantial proof of actually having sought any jobs with which she would compare her job. As previously explained, the Eleventh Circuit has not adopted the avant garde "comparable worth" substitute for an actual "equal jobs" comparison, even in Equal Pay Act cases. Cox says that she "thought about" applying for other jobs, on several occasions, *but she did not do so*. While it is arguable that her reason for not applying was an implicit intimidation against women at ACIPCO, the Court finds no such intimidation after Cox's EEOC claim was filed in 1972. Cox testified that under the *Pettway* consent decree not all jobs are subject to bidding on the basis of seniority. The *Pettway* decree is ambiguous in the context of the instant case, and is subject to more than one interpretation. Some men who obtained jobs which Cox deemed comparable to hers, and for which she was qualified, had considerably more seniority than Cox. It appears that seniority is an important criterion under *Pettway*. Cox finally moved to a plant clerical classification which had previously been all male. The *plant* clerical jobs are paid strictly by "pay group" classification, and it is impossible from the evidence to discern any attempt by ACIPCO to assign females to lower paying "pay groups". This is true of Cox. She is paid the same as all others in her "pay group".

Cox's Equal Pay Act claim, as well as her Title VII claim for disparate treatment in compensation, fails because she offered no credible evidence of a substantially similar *job* occupied by a male who was paid more than she was paid.

### Brenda Morgan

■ Brenda Morgan's case has more substance than Cox's case. In 1970, Morgan became a key punch operator. In 1971 she sought a job as a departmental clerk in the plant where at that time there were no female employees. She was turned down and was told that the job was a "night shift" job. It is apparent to the Court that a motivating factor in denying her the job in 1971 was a then implicit policy against women in the plant. A male was hired for the job. In 1972 Morgan applied for a job as a computer operator, and a male also got that job. At that time Morgan had the higher score on a computer programmer's test. Subsequently Morgan sought transfer to other clerical positions: (1) in the store room, (2) in the time office, and (3) in valve sales. Each time she was denied. In 1972 she filed her EEOC claim. This was after she had been denied the job as a computer operator, and it is her EEOC claim which led to this suit. Among the plaintiffs, she was one of the ringleaders. The Court concludes that Morgan had the necessary qualifications for one or more of the jobs which she sought, and that her failure to obtain one or more of the jobs is traceable to her sex. Although she did not testify as to the difference, if any, between the pay which she received and the pay which the recipient of any particular job she applied for received, other proof establishes that a differential in pay of $200 to $300 per month for comparable positions appertained as between *office* clerical and *plant* clerical positions. The Court finds that she did meet her burden of proof under Title VII, but not under the Equal Pay Act, and that her damages resulting from her failure to receive a job transfer because of her sex from 1971 to 1979, when she was finally promoted to computer operator, is $19,200.00.

### Joyce Pandellis

■ Neither the Supreme Court nor the Eleventh Circuit has subscribed to the "value of the job" analysis where the jobs being compared are different jobs. A fe-

**1152**

male plaintiff in an Equal Pay Act case must demonstrate by substantial evidence not only that she is paid less than a man performing another job, *but that the two jobs are essentially the same. Lemons v. City and County of Denver*, 620 F.2d 228 (10th Cir.), *cert. den.* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980). The superficially plausible analysis in *American Federation of State, County and Municipal Employees v. State*, 578 F.Supp. 846 (W.D.Wash.1983), is fundamentally implausible. It is impractical and violative of market conditions to attempt to correct all disparity between the pay for so called "women's jobs" and the pay for so called "men's jobs" by stretching the Equal Pay Act or Title VII beyond their language. The correct remedy is to make sure that all jobs are open to both sexes. In addition to failing to prove the essential sameness of the job classification to which she would compare herself, Pandellis failed to prove the difference in compensation between the two classifications. She was salaried and described herself as a computer operator. She attempted to compare herself to a departmental clerk, who obviously had essentially different skills and different responsibilities. Her complaint about not being made a computer programmer was properly answered by ACIPCO by her lack of qualifications for such a job as well as the lack of an opening for such a position when she sought it.

Pandellis testified about alleged threats of retaliation for the making of her EEOC claim, but retaliation was never an issue within the contemplation of the pleadings, and if there were any credible evidence of such threats, there was no proof that any such threats were made good in violation of Title VII.

*Joyce Crane*

██ Joyce Crane started at ACIPCO in 1971 as a key punch operator and resigned in 1981. She testified that all key punch operators in her department were female and that all accounting clerks were male. However, she did not prove how many, if any, qualified males had applied for posi-

tions as key punch operators during her tenure, or how many, if any, females, had applied for positions as accounting clerks. As already pointed out, there is a crucial difference between a job pattern in which both the management and the work force acquiesce (in the sense that there are no challenges to the pattern by qualified applicants), and a rigid pattern dictated by management's assignment of jobs, despite applications and qualifications, by the use of sexual categories. Crane failed to prove that any of the jobs to which she would compare herself were "equal" to her job in the terms required by the Supreme Court and by the Eleventh Circuit. She not only did not invoke the Equal Pay Act nor meet its burden of proof, but she failed to prove any intentional act of discrimination as required by Title VII.

*Glenda Glenn*

██ Glenda Glenn went to work for ACIPCO as a salaried stenographer in the credit department. In 1974 she became the second woman to hold a job as a clerk within the plant. Prior to the EEOC claims out of which these suits arose, females at ACIPCO had not pressed any claim to plant jobs, even to clerical positions. At ACIPCO, the office workers were and are essentially salaried, while the plant clericals were and are essentially paid by the hour. This essential difference was recognized in the consent decree in *Pettway* and sometimes results in an "apples vs. oranges" comparison. For instance, among salaried employees the ideas of "overtime" and "bid system" have no meaning. Glenn sought and immediately obtained a transfer from her salaried position to that of an hourly paid clerk in the shipping department. Since transfer, she has been paid at precisely the same hourly rate as men in the same job classification. In the plant each job carries a numbered rating, and there is no deviation in the pay schedule between employees holding the same job classification. This is not true among slaaried workers, who have salary ranges. Glenn received the very first hourly rated job for which she applied. Therefore she could not

have been discriminated against under Title VII for any refusal to give her a transfer. As the Court listened it seemed that Glenn's real complaint was that she did not receive a raise which she claims she deserved, but she did not point to a truly comparable job and a man who did receive a raise when she did not receive one. This Court is not called upon under Title VII to evaluate job performance. Glenn's feeling that she was patronized, while it may be justified, does not add up to proof of a Title VII violation.

### Bernice Huffman

■ Bernice Huffman's main complaint seems to be with her job title. Earlier, while she supervised two other female clericals, she was designated a "supervisor". After a rearrangement of her duties occasioned by legitimate business concerns, she became an administrative assistant or an executive secretary and the title "supervisor" was dropped, but at the time of the change in her job description, there was no reduction in her salary. It is impossible to equate this change of title with a demotion based on her sex, and it does not constitute a cognizable claim under Title VII, particularly under the pleadings in this case.

Huffman did apply for other positions for which she may have been minimally qualified, but ACIPCO successfully articulated reasons for giving those positions to other applicants. These reasons were rational and, in the Court's opinion, were not pretextual in that the successful applicants arguably and actually had qualifications equal to or superior to Huffman's qualifications. It is very difficult, if not impossible, where the standards are predominantly subjective, as is true in all evaluations of office workers at ACIPCO, to intrude upon the business judgment of those making the selection among competitors. The Court cannot say that any rejection which Huffman received had, as a determinative factor, sexual bias by ACIPCO, or that it applied to her a different standard. In some ways, competing employees of long standing, those whose qualities are already well known by management, are necessarily disadvantaged in their attempts to prove deliberate discrimination, because, as here, the factor of actual job performance, without regard to sex, largely formed the basis for the sincere, if difficult, choices which ACIPCO made.

### Belinda Black

■ Belinda Black was first employed at ACIPCO in 1974 as a clerk-typist in the traffic department. She applied for a job in steel pipe sales as a secretary. A female got the job. She obtained a transfer in 1979 into valve sales as a stenographer. One complaint which does not add up to a Title VII claim, is that she was assigned a desk which was different from desks assigned to males. She offered no proof as to possible different desk requirements for different job responsibilities. Her most vigorous complaint is that male clerks make more money than she does, but she offered no proof that their jobs were actually "equal" to hers, nor did she offer any proof that she sought one of those jobs and was turned down because of her sex. While jobs need not be *identical* in order to provide a basis for proving a disparity in wages, there must be a showing of *substantial similarity*. Black admitted that there were differences in the jobs as to which she would compare her job, but she did not offer credible proof that those differences are inconsequential.

### Rhonda Edwards

■ Rhonda Edwards started at ACIPCO in 1965 in the purchasing department as a salaried key punch operator. She complains of not getting an hourly paid job as a departmental clerk. She took a maternity leave in 1971 and never returned to ACIPCO. She gave as her reason for not returning that she had lost her seniority. In 1971 jobs were not held open during a maternity leave, and such a rule was not then a violation of federal law. She never applied for any of the hourly jobs to which she would now compare her job. She did not invoke the Equal Pay Act. She frankly admitted that she was unable to make spe-

cific comparisons of her job to the jobs of any particular men. Thus, she failed in her burden of proof of any of the kinds of disparate treatment based on sex which are compensable under Title VII. Furthermore, it is difficult to grant Edwards the avenue opened by the EEOC claim of others when these claims were not filed until 1972, long after any possible complaint by Edwards had matured.

### Jewell Smith

■ Jewell Smith was employed at ACIPCO in 1973 for the second time. She was terminated in 1980. She offered no proof that her termination was motivated by sex, that is, unless absenteeism because of sick children is automatically excusable in a female employee when it would be inexcusable in a male employee. There were several discussions between ACIPCO and Smith about her absenteeism before her termination, although the precise reason for her termination, if any, was never stated, either by Smith or by ACIPCO. Her complaint that men made more money than she did is based on a "comparable worth" theory, and her opinion of the value of her job in comparison to demonstrably different jobs does not add up to a Title VII claim.

### Julia Womble

■ Julia Womble was first employed at ACIPCO in 1966. She left ACIPCO and returned in 1974 as a secretary in the engineering department. She obviously performed important functions, not only including typing for the engineers, but acting as receptionist, answering the telephone, preparing reports, verifying invoices, etc. She was and still is the only female in the engineering department. She testified that a male "clerk" in her department, who has "less responsibility" than she has, is paid more than she is paid. She said that she actually should be called "office manager" rather than "secretary". She describes her job as unique. The Court willingly acknowledges that her job is important and unique, and it may well be more "valuable"

to ACIPCO than that of the male clerk who receives more pay, but the Court is unwilling to substitute its judgment for that of ACIPCO in evaluating its various job classifications. This is only a reiteration of the obvious, namely, that Womble's case depends for its success on a claim of disparate pay based on the concept of "comparable worth", a theory which the Court must again reject.

### Glenda Duncan

Glenda Duncan came to ACIPCO in 1971 as a mail girl. In 1974 she heard that she could double her pay by getting a plant clerical job. She applied for the job of shipping clerk in the plant, got the job, and by doing so increased her pay as she had anticipated. In 1978 she became a billing clerk in the plant. Since transferring to the plant, she has always received the same pay which a man in the same job classification receives.

■ In 1972, Duncan's husband had a gall bladder operation. She did not receive medical benefits because of an ACIPCO policy then existing which discriminated between married female and married male employees. Shortly thereafter, this differential was eliminated. It may be that this policy change in medical benefits is attributable to the EEOC claims which preceded this suit. It is not compensable here as to Duncan.

Duncan's participation in this case seems more to serve the purpose of providing proof for other plaintiffs of the differential in pay between plant clerical jobs, which historically have been "men's jobs", and office clerical jobs which have historically been "women's jobs". The era at ACIPCO of rigid lines of demarcation between "men's jobs" and "women's jobs" has passed, and Duncan participated in its passing. Duncan can look with pride upon her participation, but it does not follow that she has a cause of action for sex discrimination. She failed to prove a claim under Title VII.

*Rebecca Self*

■ Rebecca Self came to ACIPCO in 1971 as a clerk, left ACIPCO and returned in 1974 as a medical transcription clerk. It was not until 1977 that she applied for a transfer into a plant job for more pay. She did not achieve such a transfer until 1982 when she finally became a billing clerk in the shipping department. The proof is that the difference in pay between office clerical and plant clerical is between $200 and $300 per month in favor of the plant clerical jobs. The only question here is whether or not ACIPCO's refusal to transfer Self to a plant job between 1977 and 1982 was in any way attributable to her sex. Two white men got two of the plant jobs for which Self applied: One black man got one of the plant jobs for which Self applied. Two of these men had less company-wide seniority than Self had. Self had to use her own devices to discover the job openings. She was regularly discouraged by her male superiors from applying for any of these plant jobs. This oral discouragement is a pretty good indicator that Self was a victim of a sexually motivated refusal to transfer her to a higher paid job for which she was qualified. She obviously had the qualifications to handle a plant clerical job. She did not suddenly obtain those qualifications in 1982 when she finally achieved her goal. It may well have been true, and probably was true, that Self's bosses in the medical department were so fond of her and so pleased with her work that they hated to lose her. Their obstructionism was sometimes blunt and sometimes subtle, but undoubtedly it was patronizing and was tinged with a sexual bias, even if a friendly one. If their motives had been as pure as the driven snow, they constituted a violation of Title VII, inasmuch as sex was a factor.

Self has no complaint about any differential in pay after 1982, because all plant employees in the same job classification receive the same rate of pay. However, the Court finds that between 1977 and 1982, Self was denied a promotional transfer because of her sex and therefore is entitled to damages in the sum of $15,000.00.

The Court sympathizes with ACIPCO for the dilemma it found itself in when it had to choose between a white female and a black male for one of the plant clerical openings between 1977 and 1982. Such choices create a "no win" situation sometimes, but the Court nevertheless cannot avoid concluding that there was an impermissible consideration of Self's sex while evaluating her for transfer to a plant job between 1977 and 1982. Title VII *equally* prohibits discrimination on account of race *and* discrimination on account of sex. *Pettway* cannot subtract from that fact.

*Mary Jane Seabury*

Mary Jane Seabury was the first female at ACIPCO to obtain a transfer to a plant clerical position, an event which occurred in 1973 when Seabury became a departmental clerk in the melting department. Earlier in 1973 Seabury had been rejected for a plant clerical job, probably because she was a woman, but her quick success thereafter as the female pioneer at ACIPCO in a plant clerical position renders any damages she sustained as a result of her first rejection *de minimis*.

■ Seabury's claims of sex discrimination after 1973 are based (1) on her charge that she has been harassed, (2) her charge that ACIPCO has refused to promote her to higher paying jobs because of her sex, and (3) her charge that on the "comparable worth" theory she should receive higher compensation. Because she failed to prove the job duties and responsibilities of the men with whom she would compare herself and relied on the rejected "comparable worth" theory, her claim of unequal compensation fails. The Court finds no evidence that there was any sexual harassment of Seabury traceable to ACIPCO and compensable under Title VII. The Court finds that ACIPCO's articulated reasons for promoting others in preference to Seabury are legitimate reasons and that its decisions were not motivated by any sexual bias but rather by a sincere consideration of the qualifications of the various appli-

cants. It may have chosen unwisely, but it had the power of choice so long as it did not have illegal motivations.

### Jerri Ogletree

In 1972 Jerri Ogletree was hired as a salaried steno-clerk in valve sales. In 1974 and 1975 Ogletree asked for a job change, but she was unspecific as to what position or positions she sought. She simply wanted a change. She was finally offered and accepted a job as a customer service representative. She held that position for approximately four years until 1977 when she asked to be relieved of the position to take a less demanding job as a secretary. She attempted to "compare" her secretarial job to a clerical job in the production control department, but she demonstrated no real familiarity with the production control job, and she did not even know the level of compensation in that job. She completely failed to prove a case of disparate compensation under Title VII.

### Mary Dianne Lee

Mary Dianne Lee came to ACIPCO in 1973 as a clerk in valve sales. Her main complaint seems to be the absence of sufficient "merit" raises as to which she deemed herself deserving. On one occasion she refused a job which would have carried an increase in pay. She offered no proof of applying for any job for which she was qualified, and to which she was not appointed. She necessarily relies on the "comparable worth" theory, a concept which the Court again points out is not the law under the Equal Pay Act, which she did not invoke, nor under Title VII, which she did.

### Karen Williams

Karen Williams applied at ACIPCO in 1974 after her father, an ACIPCO employee, told her that ACIPCO had opened up plant clerical jobs to women. Williams got a job as a clerk in valve sales, after which she immediately began to press for a transfer to a plant clerical position. She constantly kept her ears open for plant clerical vacancies. She applied, either formally or informally, for such jobs between 1974 and 1979, when she finally won a transfer to a plant clerical position in shipping. While there may have been other excuses given her when she was turned down each time from 1974 until 1979, the Court recalls two excuses in particular: (1) "You can't work in the maintenance department because your father works there"; and (2) "The man has seniority over you". If seniority were a legitimate reason, in at least one instance when Williams was turned down the man who got the job did not have seniority over Williams. After obtaining a plant clerical position, there was a reduction-in-force which caused Williams to take a plant job in a non-clerical position as a "serviceman", exercising her plant seniority. There were no other female servicemen at that time. (This designation by the Court should not be interpreted as a statement of the obvious, but simply as a recognition that ACIPCO's job classification is "serviceman" and not "serviceperson"). Williams suffered some expressions of derision from her fellow employees while a serviceman, but she suffered no compensable injury under Title VII. In 1983 she returned to her job as a departmental clerk in shipping after ACIPCO's business picked up.

The Court believes that but for her sex Williams would have succeeded sooner in obtaining a transfer into a higher paying clerical job in the plant. However, this Court cannot find that she was discriminated against in this regard from the very moment she was employed in 1974 until she got a plant job in 1979. In 1974 she accepted a non-plant salaried job with her eyes wide open. It is difficult to ascertain exactly when she should have succeeded in obtaining a transfer but for her sex, but the Court finds that she did sustain damages as a result of the failure to transfer her, and using the pay differential to which she testified of $200 to $250 per month, the Court assesses her damages at $5,200.00.

## Beverly Ann Walker

Beverly Ann Walker has been a plant clerical worker at ACIPCO since 1974, and therefore has been paid precisely the same wage as men in her job classification since 1974. In this case she served more as a witness and as a describer of various jobs than as a true Title VII plaintiff. She did complain that her job should have been reevaluated and placed in a higher paying category, but the undisputed evidence is that she appealed her reevaluation in accordance with the machinery approved in the *Pettway* decree and lost her appeal. Her feeling that the men involved in the procedure were condescending and judgmental may be understandable, but her feeling does not rise to the level of proof which would call for judicial circumvention of the internal promotional procedures at ACIPCO, particularly when those procedures bear the imprimatur of this Court in *Pettway*. Here again, the impact of *Pettway* is bothersome, but once Walker invoked its procedures she probably effectively removed herself from this case as to any claim she presented there.

## Daphne Gay Johnson

Daphne Gay Johnson was first employed at ACIPCO in 1979, long after this suit was filed. She took a job as a medical invoicing typist, a job which she still occupies. She has applied for plant clerical jobs and has not received one. The Court, however, is not convinced that her failure to obtain a departmental clerk's job is attributable to her sex. There are just so many plant clerical jobs, and Johnson has been at ACIPCO a relatively short period of time. She did not offer any proof as to what person received the jobs for which she applied. For aught appearing, the successful applicants were females and/or better qualified males.

## Judy Lockard

Judy Lockard started at ACIPCO in 1970 as a key punch operator. In 1979 she was promoted to key punch supervisor where she supervises four or five operators. In 1975 she applied for a position as payroll clerk in the plant, but a man got the job, although according to Lockard he had no more education or seniority than she had. She did not distinguish between the kinds of seniority as recognized in *Pettway*. Lockard was fired by ACIPCO in 1979, but she offered no proof that her termination was a result of sexual bias, and there was no explanation of her termination. As a supervisor Lockard was making $1,000.00 per month. She offered no proof as to how much those persons holding the jobs for which she applied were paid in comparison to her pay as a supervisor, much less that the successful applicants were not equally well qualified. Lockard did not prove disparate treatment based on sex.

## Velma Waldrop

Velma Waldrop is black. She is now a college graduate and is working on a masters degree. Much of her educational success has been accomplished while employed at ACIPCO, and much of her education has been paid for by ACIPCO in accordance with its policy of making tuition grants. Waldrop became the first black female clerk employed at ACIPCO when she became a key punch operator in 1972. At first she felt harassed by white females. She basically complains that she has not achieved promotions and/or transfers for which she feels qualified. In some instances she has been told that she is "over-qualified". Her white female supervisor has been helpful in sponsoring her for various openings, but she has received discouraging responses from white male management. She filed an EEOC charge which complains both of discrimination based on *race* and discrimination based on sex.

Waldrop's case is doubly perplexing because of *Pettway*. Waldrop is inescapably a member of the plaintiff class in *Pettway* and has therefore obtained redress for all acts of discrimination at ACIPCO occasioned by her race. There was no testimony upon which this Court can distinguish between the damage, if any, sustained by Waldrop because of her race, and the damage, if any, sustained by Waldrop because of her sex. Without denying the theoretical possibility of making a distinction between types of discrimination and

giving separate awards to a black female for two types of discrimination, the Court here finds no basis in this evidence upon which to make such a distinction. Of course if ACIPCO should fail to honor the terms of the consent decree in *Pettway* as it may apply to Waldrop, she has her remedies in *Pettway*. With no way to rationalize a double recovery for Waldrop, the Court declines to do so.

*Patricia Ann Terry*

■ Patricia Ann Terry applied for a job as a typist at ACIPCO in 1977 and started as a file clerk. She is black. She testified that she was told that her typing was sloppy, an evaluation of her performance with which she strongly disagreed. She attempted to compare her job to allegedly higher paying jobs, but without knowledgeably describing the real differences in the jobs, relying on the concept of relative worth to ACIPCO of particular jobs. This again runs into the probability that every person considers his or her job just as important as any other job. Terry never sought a plant clerical job at an hourly wage. Not only does Terry run afoul of the preclusive effect of *Pettway*, being a member of its plaintiff class, but she failed to prove discrimination under Title VII.

## CONCLUSIONS

The Court commiserates with plaintiffs' counsel who may be called upon to explain to their 23 clients the differing results obtained for each of them. The Court hopes that this opinion will assist counsel in this delicate matter.

■ In looking at the individual cases presented by the 21 plaintiffs who remained while ACIPCO presented its case, the Court has ignored: (1) the limitations contained in the initial description of the now-decertified class, (2) the statute of limitations as to those individuals who would otherwise be barred but for their having been a member of the class prior to its decertification, (3) the absence of the EEOC prerequisites as to certain individuals who were class members prior to the decertification, and (4) *Pettway* to the ex-

tent that it can be overlooked. Fortunately for the Court, the 19 white plaintiffs are not collaterally attacking or attempting to circumvent the consent decree in *Pettway* and are not claiming so-called reverse discrimination. Such a claim would necessarily have triggered a full scale confrontation with the possible preclusive effect of the consent decree in *Pettway*. The Court is glad it did not have to say the obvious, namely, that no ACIPCO employee who was not a party to the *Pettway* decree is in any way bound by it, because a so-called consent decree must always give way to the requirements of due process. *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983). What will happen in the future when and if females at ACIPCO are adversely affected by the concepts of "lines of progression", "excluded jobs", "seniority", etc., will have to await their complaint.

The only violations which the Court has found are related to ACIPCO's previous, now withered, policy of reserving plant clerical jobs for men. It is only in this area that the Court finds ACIPCO to have been too late with too little.

Although the Court has found a violation of Title VII for discriminatory action as to three plaintiffs based on their sex, the Court declines to grant injunctive relief, because an injunction has already been issued by this Court in *Pettway* against any violation of Title VII based on sex. An injunction in this case would be a redundancy.

In all probability the Court should have granted 18 more motions under Rule 41(b), F.R.Civ.P., than it granted at the conclusion of the plaintiffs' 23 cases in chief. Nevertheless, the Court felt it needed to hear from ACIPCO. For that reason the Court gave the 18 plaintiffs who did not recover the benefit of every doubt and required testimony from ACIPCO.

■ As tentatively stated in its decree of December 30, 1983, the Court finds that even those plaintiffs who did not obtain individual awards are prevailing parties in the sense that their suits resulted in what might be called an "attitude adjustment" at ACIPCO and in opening up plant jobs, an

event which might not have taken place as soon or as dramatically if this suit had not been filed. For this reason the Court invites plaintiffs' counsel to submit a request for an award of attorney's fees unless the parties can agree upon an appropriate fee, something which the Court encourages the parties to do.

An order in accordance with this Memorandum Opinion will be entered separately.