Angeline S. PROTOS, Appellee,

v.

**VOLKSWAGEN OF AMERICA, INC., Appellant.**

No. 85–3591.

United States Court of Appeals, Third Circuit.

Argued June 4, 1986.

Decided July 29, 1986.

---

James P. Hollihan (argued), Manion Mc-Donough & Lucas, Pittsburgh, Pa., for appellant; Dennis M. Wilt, Volkswagen of America, Inc. Troy, Mich., of counsel.

James W. Carroll, Jr. (argued), Tabakin & Carroll, Pittsburgh, Pa., for appellee.

Before ADAMS, WEIS, and HIGGIN-BOTHAM, Circuit Judges.

**OPINION OF THE COURT**

ADAMS, Circuit Judge.

Under Title VII of the Civil Rights of 1964, employers are required to make reasonable accommodation for the religious practices of their employees. In this case, the district court, 615 F.Supp. 1513, ruled that Volkswagen of America, Inc. (Volkswagen) had violated the statute by refusing to accommodate the request of an assembly line employee to be excused from overtime work on Saturday, her Sabbath. This appeal requires us to consider whether the trial judge erred in determining that accommodation of the request would not cause the company undue hardship, and whether damages were correctly calculated. The company also challenges the constitutionality of the reasonable accommodation requirements. For the reasons that follow, we will affirm the court's decision in part but remand for a recalculation of damages.

I.

Angeline S. Protos is a member of the Worldwide Church of God. Under the tenets of that church, the Sabbath lasts from sunset Friday to sunset Saturday. Work is prohibited during this time, and failure to observe the Sabbath is cause for excommunication.

On May 9, 1979, Protos was hired by Volkswagen to work on the assembly line of its plant in New Stanton, Pennsylvania. She was assigned to the Trim Department as an assembler; her task was to connect four color-coded wires to four connectors, and to attach a ground screw. At first, this job did not conflict with her religious principles, since the assembly line on which she worked operated from Monday through Friday and the workday ended before sunset. In August 1979, however, Volkswagen announced that in the upcoming months it would begin to schedule mandatory overtime work on a significant number of Saturdays.

Protos presented her supervisor with a note stating that as a member of the Worldwide Church of God she was unable to work on Saturdays. Her supervisor responded that while he did not believe she could be excused altogether from Saturday assignments, he would seek to devise some solution. Protos, however, made it clear that her religion prevented her from working on any Saturday. Subsequently, she provided her supervisor with a note from her minister explaining that in the Worldwide Church of God there were "no exceptions" to the prohibition of labor on the Sabbath.

Overtime work was scheduled for Protos' shift on September 22, October 6, and October 13, all Saturdays; Protos was absent on each of those days. The company took no immediate action, however, as the company's Industrial Relations Department considered the appropriate response. But following her failure to appear on the next scheduled Saturday, the Industrial Relations Department advised her supervisor that any future absences should be disciplined. When informed of this decision, Protos reiterated her position, and after her absence on December 8, the next scheduled Saturday, Volkswagen issued a formal written warning, the first step in the company's graduated disciplinary system.

Protos then filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging that the company's action contravened Title VII, 42 U.S.C. 2000e *et seq.* (1982). That action prompted Volkswagen to undertake further inquiry, which convinced the company of the sincerity of Protos's religious beliefs. As a result, the company explored the possibility of assigning Protos to a new post where Saturday overtime was not required. But there was a waiting list of 200 people for transfer to the Facilities Maintenance Department, where such a position was available, and all those on the list had greater seniority. Protos's transfer could not be arranged without a waiver by the employees union, a local of the United Autoworkers of America (UAW), of the seniority provisions of the collective bargaining agreement. On February 1, 1980, Volkswagen requested a waiver, but the union refused.

Saturday overtime was subsequently scheduled on February 2, 23, and March 15. Protos did not appear for any of these days. The company invoked the escalating sanctions for unexcused absences provided for in its regulations, and, after suspending her twice, dismissed Protos on March 15, 1980.

On November 17, 1980, the EEOC issued a determination that there was reasonable cause to believe that Volkswagen had violated Title VII. On February 22, 1984, it issued a Notice of Right to Sue. Protos timely filed suit, and the case was tried, from July 16 to July 24, 1985, before a district judge sitting without a jury.

The principal issue before the district court was the degree of hardship that accommodating Protos's request for Saturdays off would have imposed on Volkswagen. Finding that "defendant suffered no economic loss" because of Protos's absence, and that the "efficiency, production, quality and morale" of her segment of the Trim Department and the entire assembly line remained intact without her, the district court ruled that Volkswagen could have accommodated her "without undue hardship and at no cost." Thus, the company was held to have violated the statute.

Volkswagen had also contended that Title VII's religious accommodation requirement contravened the Establishment Clause of the First Amendment. Following several federal appellate court decisions, the court rejected that challenge. As relief, the court awarded Protos $73,911.36 in lost pay and benefits; it declined to deduct from that award unemployment benefits she had received during her time out of work. The court also ordered Protos reinstated effective June 1, 1980, although there was no work at the plant currently available. Volkswagen filed a timely appeal.

## II.

### A.

Section 703(a)(1) of the Civil Rights Act of 1964, Title VII, makes it an unlawful employment practice to "discharge ..., or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1982). Section 701(j) of the Act, added by Congress in a 1972 amendment, elaborated on this provision by defining religion:

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j). "The intent and effect of this definition was to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271–72, 53 L.Ed.2d 113 (1977).[1]

*Hardison* is the only case in which the Supreme Court has interpreted the extent of the employer's obligation under the statute. There, the employee, also a member of the Worldwide Church of God, worked in an airline maintenance department that operated twenty-four hours a day. A conflict between his religion's demands and his work schedule arose when he was transferred, at his own request, to a new position in the department where he lacked sufficient seniority to avoid Saturday assignments. The union would not agree to a change of assignments for him in violation of the seniority agreement. Hardison also proposed to work only four days a week, but the company refused to accept that proposal.

The Court held that the company did not violate Title VII by failing to excuse Hardison from working on Saturday. In its central holding, the Court ruled that the reasonable accommodation requirement did not compel an employer to abrogate a collective bargaining agreement in order to enable an employee to satisfy religious observances. 432 U.S. at 81, 83, 97 S.Ct. at 2276. As for allowing the employee to work only four days a week, suggested by Hardison as an alternative means of accommodation, the Court held that this would create an "undue hardship" for the company. "Hardison's job was essential, and on weekends he was the only available person on his shift to perform it." 432 U.S. at 68, 97 S.Ct. at 2269. To allow him to work only four days, the Court reasoned, the company would either have to fill his position on Saturdays with supervisors or qualified personnel from other departments, or with employees from his department paid at overtime wages. "Both of these alternatives would involve costs to TWA either in the form of lost efficiency in other jobs or higher wages...." 432 U.S. at 84, 97 S.Ct. at 2277. Relying on the district court's finding that these solutions would have " 'created an undue burden on the conduct of TWA's business' " 432 U.S. at 84 n. 15, 97 S.Ct. at 2277 n. 15, the Court concluded that the company did not have to incur such costs to accommodate Hardison. "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." 432 U.S. at 84, 97 S.Ct. at 2277.

■ Since *Hardison*, several courts of appeals have set forth guidelines to use in evaluating a religious accommodation case: those guidelines are modeled after the shifting burdens of proof employed in race and gender discrimination suits under Title VII. A plaintiff must first establish a prima facie case, by showing: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Turpen v. Missouri-Kansas-Texas Railroad Co.*, 736 F.2d 1022, 1026 (5th Cir.1984). *See also*

---

1. The amendment was intended to clarify the scope of an EEOC guideline, 29 C.F.R. § 1605.1 (1968), which required employers to make reasonable accommodations "to the religious needs" of employees and prospective employees, short of undue hardship. As an example of a situation where undue hardship may exist, the guideline posited the case of an employee whose "needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer." *Id. (quoted* in *Hardison*, 432 U.S. at 72 n. 7, 97 S.Ct. at 2271 n. 7).

*Philbrook v. Ansonia Board of Education,* 757 F.2d 476, 481 (2d Cir.1985), *cert. granted,* — U.S. —, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *Brown v. General Motors Corp.,* 601 F.2d 956, 959 (8th Cir. 1979); *Anderson v. General Dynamics Convair Aerospace Division,* 589 F.2d 397, 401 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to produce evidence showing that it cannot reasonably accommodate the worker without incurring undue hardship.

### B.

In the case at hand, the district judge followed these guidelines in considering the evidence. His determination that Protos established a prima facie case is not disputed on appeal. Volkswagen agrees that Protos's religious beliefs are sincere, and it is clear that her religion forbade her to work on Saturdays. It is also evident that she informed her employer of her beliefs and was disciplined for failure to work on Saturdays.

■ Thus, the primary issue is whether the district court erred in determining that the company would not have to incur even a *"de minimis* cost" to accommodate Protos.[2] Volkswagen first maintains that because Protos sought a guarantee of having all Saturdays off, her request was by definition incapable of being reasonably accommodated. It relies on *Jordan v. North Carolina National Bank,* 565 F.2d 72 (4th Cir.1977), which held that a demand for every Saturday off "was so unlimited and absolute in scope—never to work on Saturday—that [it] speaks its own unreasonableness and is thus beyond accommodation." 565 F.2d at 76.

The *Jordan* analysis, however, has not been followed by other courts. *See, e.g., Brown v. General Motors Corp.,* 601 F.2d

at 960–61 n. 6. To interpret Title VII in this fashion would effectively remove from the statute's protection all employees who subscribe to religions with strict prohibitions against Sabbath labor. By its terms, however, § 701(j) encompasses within its scope "all aspects of religious observance and practice, as well as belief," and the EEOC guideline after which it was modeled specifically referred to observation of the Sabbath as an example of a protected observance, *see* 29 C.F.R. § 1605.1 (1968). Indeed, the *Hardison* court itself proceeded on the premise that a Sabbath observer was entitled to be accommodated by her employer, and that the only question was "the reach of that obligation" on the part of the employer. 432 U.S. at 66, 97 S.Ct. at 2268. Consequently, we agree with the district court's rejection of the argument that an employee's request for a guarantee of never working on the Sabbath does not invoke the employer's duty to accommodate.

■ As an alternative ground for overturning the district court's decision, Volkswagen challenges the determination that it would not incur undue hardship if it were to accommodate Protos. The company maintains that it more than exceeded the *"de minimis"* showing of cost set out in *Hardison.*

With other courts, we recognize that the determination "whether a particular accommodation works an undue hardship on either an employer or union must be made by considering 'the particular factual context of each case.'" *Tooley v. Martin-Marietta Corp.,* 648 F.2d 1239, 1243 (9th Cir.1981), (*quoting Anderson,* 589 F.2d at 400). "The *magnitude* as well as the *fact* of hardship must be determined by the examination of the facts of each case." *Tooley,* 648 F.2d at 1243.

Here, the question of hardship was vigorously disputed at trial. The evidence

---

**2.** In addition to her religious accommodation argument, Protos maintains that she prevailed in the district court on a disparate treatment claim "under traditional Title VII principles." This contention lacks merit. While it may be

correct that Protos was the only employee at the plant discharged for refusing to work overtime on Saturday, there is no evidence that any other employee asked to be excused from all Saturday overtime.

showed that Volkswagen regularly maintained, along with employees assigned to specific posts on the assembly line, a crew of roving absentee relief operators (ARO) to be deployed as substitutes for absent employees. Protos introduced witnesses who testified that her job was easily learned, and that the line operated as efficiently when an ARO served in her stead as when she performed the job. Volkswagen's witnesses, by contrast, testified that the line operated with diminished efficiency in Protos's absence.

The court resolved this conflict in favor of Protos, finding that "plaintiff's witnesses were more credible than the witnesses presented by the defendant," and that "the efficiency, production, quality and morale of trim 15 and the entire assembly line remained intact during her absence." While Volkswagen argues that plant-wide absenteeism was especially high on Saturdays, and that Protos's absence therefore was felt more than it would otherwise have been, evidence supporting this contention was presented to the district court, and rejected as unpersuasive. Moreover, unlike the accommodation proposed in *Hardison*, the employer here was not obliged to pay higher wages in order to fill Protos's vacancy. The district court articulated the correct legal standard, as set forth in *Hardison*. And although we are inclined to believe the hardship question was considerably closer than the district court did, we cannot say that its factual determinations, based on its assessment of the witnesses' credibility and its familiarity with the evidence, are clearly erroneous. *See* Fed.R.Civ.P. 52(a).[3]

### III.

Volkswagen also asks us to hold that the religious accommodation requirement of Title VII violates the Establishment Clause of the First Amendment. We find no constitutional infirmity, however.

The company's constitutional argument is straightforward: by requiring employers to accommodate employees' religious practices and observances, the statute confers a benefit on religion. While an employer must accommodate an employee who seeks a day off for religious reasons, it is argued, the employer need not accommodate a worker's desire to spend more time with his or her family.

Under the test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), a statute does not violate the Establishment Clause if it has a secular purpose, has a primary effect that neither advances nor inhibits religion, and does not cause excessive government entanglement with religion. Applying this test, four other courts of appeals have considered the constitutionality of § 701(j). All have upheld it. *See, e.g., McDaniel v. Essex International, Inc.*, 696 F.2d 34, 37 (6th Cir. 1982); *Tooley*, 648 F.2d at 1244–46; *Nottelson v. Smith Steel Workers D.A.L.U.*, 643 F.2d 445, 453–55 (7th Cir.1981), *cert. denied*, 454 U.S. 1046, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981); *Hardison v. Trans World Airlines, Inc.*, 527 F.2d 33, 43–44 (8th Cir.1975), *rev'd on other grounds*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). These courts have declared that the statute works to protect freedom of conscience and prevent discrimination against adherents of minority faiths. *See, e.g., Nottelson*, 643 F.2d at 454.

Volkswagen, however, relies on the more recent Supreme Court decision in *Thornton*

---

**3.** Volkswagen maintains that the determination whether accommodating Protos would create an undue hardship presents a mixed question of law and fact, and thus is subject to review on a plenary basis rather than according to the "clearly erroneous" standard of Rule 52(a). However, where, as here, the district court has articulated correctly the *de minimis* standard as set forth in *Hardison*, reviewing courts have evaluated the lower court's conclusion on undue hardship as a factual finding subject to Rule 52(a). *See, e.g., Turpen*, 736 F.2d at 1026–27; *Brener v. Diagnostic Center Hospital*, 671 F.2d 141, at 146–47 (5th Cir.1982); *Tooley*, 648 F.2d at 1243–44. Moreover, in this case, the trial court's conclusion depended heavily on its assessment of the witnesses' credibility, and deference to the trial court is most warranted where such credibility determinations are at issue.

v. *Caldor, Inc.,* — U.S. —, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), where the Court struck down a Connecticut statute guaranteeing employees the right not to work on their Sabbath. It held that the statute contravened the "effects" prong of the *Lemon* test.

Writing for the Court, Chief Justice Burger stressed the absolute nature of the preference accorded Sabbath observers by the Connecticut law. As he observed, the statute "commands that Sabbath religious concerns automatically control over all secular interests at the workplace," and "takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." 105 S.Ct. at 2917. He went on specifically to note: "There is no exception when honoring the dictates of Sabbath observers would cause the employer substantial economic burdens or when the employer's compliance would require the imposition of significant burdens on other employees required to work in place of the Sabbath observers. Finally, the statute allows for no consideration as to whether the employer has made reasonable accommodation proposals." *Id.* Because it decrees an "unyielding weighting in favor of Sabbath observers over all other interests," the statute goes beyond having an incidental or remote effect of advancing religion, and has a primary effect of advancing "a particular religious practice." *Id.*

In a concurrence, Justice O'Connor, joined by Justice Marshall, expressed the understanding that Title VII's accommodation requirement would pass muster under the effects prong of the *Lemon* test. "Since Title VII calls for reasonable rather than absolute accommodation and extends that requirement to all religious beliefs and practices rather than protecting only the Sabbath observance, I believe an objective observer would perceive it as an anti-discrimination law rather than an endorsement of religion or a particular religious practice." 105 S.Ct. at 2919.

Unlike the Connecticut statute, Title VII does not require absolute deference to the religious practices of the employee, allows for consideration of the hardship to other employees and to the company, and permits an evaluation of whether the employer has attempted to accommodate the employee. Volkswagen contends that as applied in this case, Title VII provided a primary benefit to religion because Protos sought an absolute guarantee of exemption from all Saturday labor. However, in determining whether she was entitled to such a guarantee, the court considered the impact accommodating her would have on "secular interests of the workplace," *Thornton,* 105 S.Ct. at 2917, and found that given the nature of Protos's assembly line position and Volkswagen's method of providing substitutes for absent employees, her absence would not significantly affect those interests. Any effect the statute has of advancing religion, therefore, would appear to be incidental to its primary effect of promoting freedom of conscience and prohibiting discrimination in the workplace.

Nor do we believe it can be said that the statute lacks a secular purpose, or that it would lead to excessive government entanglement with religion. The accommodation requirement is "plainly intended to relieve individuals of the burden of choosing between their jobs and their religious convictions, where such relief will not unduly burden others. This is ... a secular purpose, part of our 'happy tradition' of avoiding unnecessary clashes with the dictates of conscience." *Nottelson,* 648 F.2d at 445, (*quoting United States v. McIntosh,* 283 U.S. 605, 634, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (1931) (Hughes, C.J., dissenting)).

 As for excessive entanglement of government and religion, the statute does not pose the danger of bringing about any interplay of the sort the Establishment Clause seeks to avoid. To be sure, Title VII does require the EEOC or the courts to evaluate a plaintiff's claimed entitlement to accommodation of her religious principles. But all the government must do is ascertain whether the employee's belief is religious and is sincerely held, just as the

government does in ruling on conscientious objector applications. *See Nottelson,* 643 F.2d at 455. While courts may not inquire into the verity of a religious belief, "it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity of someone's religious beliefs in both the free exercise context, and the Title VII context." *Philbrook,* 757 F.2d at 481 (citations omitted). *See also United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944).

It is true, of course, that under the statute, Volkswagen must accommodate Protos's religious practices, but not, for example, the desire of one of her coworkers to spend a particular day with his or her family. However, the Supreme Court has never held that the Establishment Clause forbids government from taking any action whatsoever that benefits religious interests. While it is axiomatic that the Establishment Clause has as a central purpose ensuring government neutrality in matters of religion, *see Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), " '[n]eutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties, so long as an exemption is tailored broadly enough that it reflects valid secular purposes." *Gillette v. United States,* 401 U.S. 437, 454, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971) (citation omitted) (sustaining constitutionality of conscientious objector exemption from military service).[4] Title VII's religious accommodation provision attempts to minimize the economic sacrifices imposed on individuals because of their spiritual principles. The Establishment Clause does not prohibit such an effort.

### IV.

The district court in awarding relief relied on the parties' stipulation that had Protos not been discharged in 1980 for refusing to work on Saturdays, she nonetheless would have been laid off on January 22, 1983 because of declining business. The court stated that she would have received $49,495.25 in wages through this date along with $13,525.11 in fringe benefits. Finding that Protos was unable to obtain alternative employment following her discharge, the court awarded her this entire sum.

In addition, according to the stipulation, Protos would have been temporarily laid off in various weeks because of short-term slowdowns during the period between 1980 and 1983. The court awarded her $6,355 as the equivalent of the amount of unemployment benefits she would have received during these temporary layoffs. In fact, while Protos was out of work, she did receive $8,379 in unemployment benefits. Following the rule of *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77 (3d Cir.1985), the district court declined to deduct the $8,379 from her award. It further noted that if she had been laid off on January 22, 1983, rather than in 1980, she would have been eligible for unemployment benefits thereafter at a slightly higher rate than she actually was paid, because of her greater experience. The court therefore awarded her an additional $4,536, the difference between the benefits she received following her 1980 dismissal and those she would have received if laid off later.

Volkswagen contends that the court erred by awarding Protos amounts to compensate her for unemployment benefits she would have received for temporary layoffs between 1980 and 1983, and for the higher rate of unemployment benefits she would have received following January 22, 1983 if she had been laid off then rather than in

---

**4.** The breadth of the "exemption" afforded by Title VII is underscored by the fact that in defining religion, the EEOC has used the same broad definition as the Selective Service employs for conscientious objector purposes. *See, e.g.,* CD 76–104 (1976), CCH Emp.Prac. ¶ 6500. In the Selective Service context, the Supreme Court has held that to qualify as religious, a belief need not be a traditional faith, or be based on a Supreme Being; a religious belief may be one that is "purely moral and ethical in source and content but that nevertheless imposes upon [its holder] a duty of conscience...." *Welsh v. United States,* 398 U.S. 333, 340, 90 S.Ct. 1792, 1796, 26 L.Ed.2d 308 (1970).

1980. These sums, it contends, are compensatory damages, which may not be awarded under Title VII. We agree.

Title VII expressly authorizes an award of backpay "or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). This Court has held that punitive damages are not available under this provision. *See, e.g., Richerson v. Jones,* 551 F.2d 918, 926–28 (3d Cir.1977). The overwhelming weight of authority from other courts is that compensatory damages are not available under Title VII either. *See e.g., Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363 (11th Cir.1982); *Padway v. Palches,* 665 F.2d 965, 968 (9th Cir.1982); *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1107 (6th Cir.1981). *See also Scott v. University of Delaware,* 601 F.2d 76, 81 n. 8 (3d Cir.1979) ("Compensatory and punitive damages are generally not recoverable under Title VII.")

In *Richerson,* this Court identified three rationales supporting its decision that punitive damages are not available under Title VII, and those reasons are equally applicable to compensatory damages. One stems from the language of the statute's remedies provision, which allows for reinstatement "with or without back pay" or other equitable remedies. 42 U.S.C. § 2000e–5(g). Like punitive damages, compensatory damages are viewed as a legal, not an equitable remedy, and thus would appear not to be authorized by the statute. *See Walker,* 684 F.2d at 1364.

Second, courts have noted that § 2000e–5(g) appears to have been modeled on 29 U.S.C. § 160(c) (1982), the provision of the National Labor Relations Act that authorizes remedies against employers for unfair labor practices, *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419 n. 11, 95 S.Ct. 2362, 2372 n. 11, 45 L.Ed.2d 280 (1975), and that that statute has been interpreted not to allow compensatory or punitive damage awards. *See Harrington v. Vandalia-*

*Butler Board of Education,* 585 F.2d 192, 194–96 (6th Cir.1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979); *Richerson,* 551 F.2d at 927. Thus, the "close relationship between 42 U.S.C. § 2000e–5(g) and 29 U.S.C. § 160(c)," *id.,* bolsters the conclusion that Congress did not intend to authorize the award of compensatory damages under Title VII.

Finally, as we also noted in *Richerson,* when Congress in 1968 enacted Title VIII, the Fair Housing laws, 42 U.S.C. § 3612, *et seq.* (1982), it specifically provided for both actual and punitive damage remedies. Yet four years later, when Congress amended Title VII to include the remedies provision of § 2000e–5(g), it did not include any damage remedy; it authorized only back pay and equitable relief. This "contrast between Title VII's equitable remedies and Title VIII's legal remedies," 551 F.2d at 928, further suggests that " 'Congress intentionally left out any provision for either general or punitive damages.' " *Walker,* 684 F.2d at 1364, (quoting *Padway,* 665 F.2d at 968).[5] Accordingly, we conclude that compensatory as well as punitive damages are not available under Title VII.

 It is clear that the prohibition on compensatory damages would bar claims for emotional distress, pain and suffering, or interest that would have been earned on the lost wages. The compensatory damages ban, however, "does not include concomitants of employment such as fringe benefits, pension benefits, or other lost work benefits...." *Walker,* 684 F.2d at 1364, which come within the equitable restitution authorized by the statute. We believe that unemployment benefits are more fairly characterized as compensatory damages rather than "concomitants" of employment. Quite simply, unemployment benefits are a concomitant not of working, but of not working. They are not payments that an employer makes to employees pursuant to an employment relation-

---

5. Courts have sometimes used the term "compensatory damages" to refer to awards of back pay or lost benefits. *See, e.g., Rosen v. Public Service Electric and Gas Co.,* 477 F.2d 90, 96 (3d Cir.1973). Subsequently, in *Richerson* we made clear that the recovery of lost pension benefits allowed in *Rosen* is, like an award of back pay itself, "actually a form of equitable restitution."

ship, but rather are made "by the state out of state funds derived from taxation." *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364, 71 S.Ct. 337, 340, 95 L.Ed. 337 (1951). Although the taxes are paid by employers, the payments do not discharge an employer's obligation to his employees, but carry out a governmental "policy of social betterment for the benefit of the entire state." *Id.*

The conclusion that lost unemployment benefits are compensatory damages not available to a plaintiff under Title VII is bolstered by the decision in *Craig.* That case presented a different question, also involving unemployment benefits and Title VII recoveries, than the one we face here: whether a defendant may deduct from a Title VII back pay award the value of unemployment benefits received by a plaintiff following her unlawful discharge. Even though such benefits supplied payment to an employee covering the same period for which the back pay award was intended to make her financially whole, we held that a defendant could not deduct the benefits from the amount paid to the plaintiff.

Our holding followed from the premise that "[u]nemployment compensation most clearly resembles a collateral benefit which ordinarily is not deducted from a plaintiff's recovery." 721 F.2d at 83. Again analogizing to the back pay provision of the National Labor Relations Act, Judge Sloviter noted that in *Gullett Gin*, the Supreme Court upheld the NLRB's refusal to deduct unemployment benefits from backpay awards under § 160(c). *Gullet Gin* also characterized unemployment benefits as "collateral," and reasoned that "[s]ince no consideration has been given or should be given to collateral *losses* in framing an order to reimburse employees for their lost

6. This case illustrates the potential for duplicative awards if lost unemployment benefits are deemed recoverable under Title VII. Consider that part of the award Protos received was to compensate her for the unemployment benefits she would have received during temporary layoffs between 1980 and 1983. Even absent the Title VII violation, Protos would have been on layoff during these periods, and would have

earnings, manifestly no consideration need be given to collateral benefits which employees may have received." 340 U.S. at 364.

In *Craig*, then, this Court declined to deduct unemployment benefits *received* from a back pay award in part based on the premise that when *lost* as a result of discharge, such collateral benefits would not be included as relief. To hold now that lost unemployment benefits are recoverable would produce an inconsistent result and grant plaintiffs a windfall not authorized by § 2000e-5(g).[6] Accordingly, we hold that unemployment benefits *lost* as a result of being wrongfully discharged are compensatory damages that may not be included in a back pay award under Title VII. It follows that the district court erred when it awarded Protos $6,355 in unemployment benefits she would have received during temporary layoffs, and $4,536 as the difference between the rate of unemployment benefits that she actually received and that she would have been paid at if laid off on January 22, 1983.

## V.

To summarize, we hold that the district court did not err in ruling that Volkswagen could have accommodated Protos without "undue hardship," and that Title VII's religious accommodation requirement does not violate the Establishment Clause. The district court erred, however, in including in Protos's backpay award compensation for unemployment benefits she would have received had she not been discharged in 1980 for refusing to work on Saturdays. The judgment of the district court will be affirmed in part and vacated in part, and remanded for further proceedings consistent with this opinion.

received only unemployment benefits. In fact, she did receive unemployment benefits during these periods. Thus, allowing her to recover the amount of these unemployment benefits in damages would constitute a duplicative recovery, and also result in the employer being required to pay an amount it would not have owed had the plaintiff continued as a Volkswagen employee.