**Curtis COWAN, Plaintiff,**

**v.**

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

**Civ. No. B-81-511 (PCD).**

United States District Court, D. Connecticut.

Sept. 21, 1987.

Joseph D. Garrison, Garrison, Kahn, Silbert & Arterton, New Haven, Conn., for plaintiff.

Wayne A. Schrader, Gibson, Dunn & Crutcher, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION ON DAMAGES

WINTER, Circuit Judge: *

In an earlier opinion, familiarity with which is assumed, I concluded that Mr.

* The Honorable Ralph K. Winter, U.S. Circuit Judge, U.S. Court of Appeals for the Second Circuit, sitting by designation.

Cowan had proven that Prudential had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1982), when his superior failed to consider Mr. Cowan for promotions for which he was qualified. Subsequently, a hearing on backpay and damages was held. After reviewing the evidence, I conclude that plaintiff suffered no loss of income as a result of not being promoted, but that he should receive $15,000 in damages for emotional distress.

## I. BACKPAY

Under Title VII, a successful plaintiff is presumptively entitled to backpay. *See Cohen v. West Haven Bd. of Police Comm'rs,* 638 F.2d 496, 502 (2d Cir.1980). Backpay and other relief authorized under Title VII "is intended to make the victims of unlawful discrimination whole, [and] requires that persons aggrieved by the consequences and the effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." 118 Cong.Rec. 7168 (1972) (statement of Sen. Williams), *quoted in Albermarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Accordingly, the statute expressly provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g) (1982). I find that Mr. Cowan is not entitled to an award of backpay because the evidence clearly demonstrates that, had he been promoted to the position of sales manager in November 1978, he would have earned less than what he could reasonably have earned as an insurance agent.

The parties disagree about the period of time over which backpay should be calculated. Mr. Cowan argues that he should receive backpay corresponding to earnings he allegedly lost between the time of Mr. Shepard's promotion in November 1978 and the time of Mr. Cowan's formal resignation from Prudential in January 1980. Prudential argues in response that plaintiff effec-

tively resigned his employment in August 1979, when, as I observed in my previous opinion, Mr. Cowan "virtually ceased work." *Cowan v. Prudential Insurance Co. of Am.,* No. B–81–511 (PCD), 703 F.Supp. 177, 184 (D.Conn.1986) ("*Cowan I*"). This controversy need not be resolved, however, because plaintiff cannot demonstrate an entitlement to backpay, even if he is correct as to the liability period.

Prudential determined the compensation of its insurance agents on the basis of their productivity. Mr. Richard Cashion, who administered the compensation plans covering Prudential's agents and managers, testified that Prudential paid its agents under what it called a "level-mix plan." Part of an agent's compensation was paid at a rate that remained fixed for thirteen-week periods; during any given calendar quarter, this portion of the agent's compensation reflected the agent's performance during the immediately preceding quarter. Prudential nevertheless guaranteed its agents a minimum weekly compensation, which at the time of Mr. Cowan's resignation amounted to approximately $220 per week. This system is illustrated by Mr. Cowan's compensation record. Until mid-November 1979, Mr. Cowan consistently received compensation at rates greatly exceeding this minimum. But Mr. Cowan's virtual cessation of work after July 1979 dramatically reduced the pay he received in the quarter that began with the week ending on November 19, 1979. During this quarter, he received only the weekly minimum.

Prudential's scheme for compensating its sales managers also utilized performance rewards and guarantees. The basic compensation of a sales manager at Prudential during the manager's first six months on the job amounted to $100 per week plus a percentage commission on the manager's own sales. An agent's commissions would typically suffer a dramatic decline upon his promotion to sales manager, however, because new sales managers had little time to devote to writing policies. After the first six months, a sales manager could receive "overrides" based upon the sales of his

staff of insurance agents in addition to his weekly salary and percentage commissions. A successful sales manager could earn in overrides an income far greater than the guaranteed minimum. But to build a successful sales staff of course takes time, and accordingly, Prudential found it necessary to guarantee to new sales managers a minimum income for two years based upon a manager's earnings during his last year as an insurance agent. During a sales manager's first year, he would be guaranteed a weekly compensation equal to forty dollars in excess of his average weekly earnings as an agent in the year preceding his promotion. During the manager's second year, he would receive a weekly compensation amounting to sixty dollars more than his weekly earnings during his last year as an agent. The parties agree that, had Mr. Cowan received the promotion that was given to Mr. Shepard, Mr. Cowan would have received $25,930.00 during the fifty-eight-week liability period.[1]

Plaintiff argues that he should receive a backpay award that is at least equal to the difference between the amount that would have been guaranteed to him during his first fifty-eight weeks as a sales manager and the earnings Mr. Cowan received during the preceding year as an insurance agent. In other words, plaintiff contends that he is entitled to the difference between the guaranteed amount and the basis from which Prudential calculated the guaranteed amount. Mr. Cowan thus contends that he should receive at least $2440, a figure representing $40/week during what would have been his first fifty-two weeks as a sales manager, and $60/week thereafter for the following six weeks (until his resignation from Prudential). This computation is flawed, however, because it would set off plaintiff's estimated earnings as a sales manager against his earnings during the period *preceding* the promotion that he was unlawfully denied. In order to "restore [plaintiff] to a position where he would have been were it not for the unlawful discrimination," 118 Cong.Rec. 7168 (1972), plaintiff's estimated earnings as a sales manager between November 1978 and January 1980 must be set off against earnings that he could have received with reasonable diligence as an insurance agent during the *same* period of time. *See* 42 U.S.C. § 2000e–5(g) ("[i]nterim earnings or amounts earnable with reasonable diligence") (emphasis added).

During the fifty-two-week period ending November 19, 1979, Mr. Cowan earned $23,660.86, or an average of $455.02 per week, as detailed in the margin.[2] Mr. Cow-

1. This amount is based upon the parties' shared assumption that Mr. Cowan would have been guaranteed $445/week and $465/week, respectively, during his first and second years as a sales manager.

2. Mr. Cowan's weekly earnings as an insurance agent during the relevant time period are set forth below:

| For the Week Ending: | Total Pay |
|---|---|
| 11/27/78 | $299.53 |
| 12/04 | 475.68 |
| 12/11 | 310.87 |
| 12/18 | 337.00 |
| 12/25 | 308.87 |
| 01/01/79 | 391.52 |
| 01/08 | 322.52 |
| 01/15 | 343.00 |
| 01/22 | 325.06 |
| 01/29 | 391.14 |
| 02/05 | 314.20 |
| 02/12 | 316.28 |
| 02/19 | 428.51 |
| 02/26 | 420.76 |
| 03/05 | 424.28 |
| 03/12 | $421.05 |

| For the Week Ending: | Total Pay |
|---|---|
| 03/19 | 404.60 |
| 03/26 | 735.94 |
| 04/02 | 402.60 |
| 04/09 | 405.86 |
| 04/16 | 402.89 |
| 04/23 | 629.20 |
| 04/30 | 402.89 |
| 05/07 | 402.89 |
| 05/14 | 420.90 |
| 05/21 | 255.23 |
| 05/28 | 344.59 |
| 06/04 | 327.93 |
| 06/11 | 313.43 |
| 06/18 | 518.63 |
| 06/25 | 328.40 |
| 07/02 | 309.95 |
| 07/09 | 378.07 |
| 07/16 | 322.22 |
| 07/23 | 356.74 |
| 07/30 | 328.79 |
| 08/06 | 332.40 |
| 08/13 | 304.15 |
| 08/20 | 597.25 |
| 08/27 | 562.54 |
| 09/03 | 598.11 |

an's earnings declined precipitously after November 19, reflecting the sharp decline in his productivity after the promotion of Arthur Lely in August 1979. Because Mr. Cowan "virtually ceased work" in August, I am obligated to estimate the amount of income Mr. Cowan could have earned after November 19 had he continued working in a reasonably diligent manner. Taking into account both the apparently cyclical nature of Mr. Cowan's earnings and the upward trend in his annual pay, I find that Mr. Cowan could reasonably have earned at least $2290.65 (or approximately $381.78/week) during the last six weeks of 1979.[3] Accordingly, I conclude that "with reasonable diligence," 42 U.S.C. § 2000e–5(g), Mr. Cowan could have earned $25,951.45 during the fifty-eight-week period ending December 31, 1979. This figure, of course, exceeds the $25,930.00 that Mr. Cowan would have been guaranteed as a sales manager during that period of time.

I also conclude that Mr. Cowan would not have received more than the guaranteed sum during his first fifty-eight weeks as a sales manager. Steven Shepard, who managed the same staff that Mr. Cowan would have managed, received neither commissions nor overrides in excess of his "guarantee" during 1979. Although I believe Mr. Cowan would have been a more successful sales manager than Mr. Shepard, there is no evidence that his success would have been achieved so quickly that he would have been entitled to overrides within fifty-eight weeks. Instead, it is probable that increasing the production of that staff would have taken somewhat more time. I thus find that during his first

year plus six weeks as a sales manager, plaintiff would have earned, before expenses, less than what he would have earned as an agent.

Plaintiff nevertheless argues that as an insurance agent he incurred expenses that he would not have incurred as a sales manager and that his earnings after expenses would have been greater had he become a sales manager. However, this argument neglects the fact that, as a sales manager, plaintiff would have incurred expenses that were at least as great as those he actually incurred as an agent. The unrebutted testimony of Salvatore Vitanza, a Prudential sales manager based in Stamford, demonstrates that Prudential's sales managers incurred out-of-pocket expenses that were quite substantial. Specifically, Vitanza testified that a sales manager should frequently entertain, at his own expense, his staff of insurance agents at lunches, dinners and parties in an effort to motivate the agents. He also stated that in the late 1970's, he would typically incur as much as six thousand dollars per year in these and other expenses. Mr. Cowan admitted on cross-examination that, had he been promoted to sales manager, he would have also spent money on his agents, "if that was the standard operating practice."

The expenses Mr. Cowan would have incurred as a Prudential sales manager would have exceeded the expenses that he actually incurred after the Shepard promotion in November 1978. Cowan contends that as an agent during 1978 he incurred expenses—for mileage, parking, tolls, telephone calls, postage and train-

| For the Week Ending: | Total Pay |
| --- | --- |
| 09/10 | $582.18 |
| 09/17 | 611.37 |
| 09/24 | 586.38 |
| 10/01/79 | 569.73 |
| 10/08 | 600.87 |
| 10/15 | 569.73 |
| 10/22 | 554.32 |
| 10/29 | 632.14 |
| 11/05 | 1732.71 |
| 11/12 | 564.92 |
| 11/19 | 440.04 |
| 11/26 | 221.00 |
| 12/03 | 221.00 |
| 12/10 | 221.00 |
| 12/17 | 221.00 |

| For the Week Ending: | Total Pay |
| --- | --- |
| 12/24 | $219.00 |
| 12/31 | 219.00 |
| [TOTAL 11/27/78–11/19/79] | $23,660.86 |
| [TOTAL 11/26/79–12/31/79] | $ 1,322.00 |

3. This estimate is the product of $2,123.47, Mr. Cowan's earnings during the last six weeks of 1978, *see supra* note 1, and 1.07873, the factor by which Mr. Cowan's earnings during the first forty-six weeks of 1979 ($21,537.39) exceeded his earnings during the corresponding period in 1978 ($19,965.49). For the purposes of these calculations, earnings for the week ending January 1, 1979 are considered earnings for 1978.

ing—that amounted to $3581.06. He also urges, based on his tax returns, that his expenses for 1979 totaled $5046.00, and that in calculating backpay this court should consider these claimed expenses for 1979 along with a prorated amount, based upon the 1978 figure, for expenses incurred during the last six weeks of 1978 (i.e., after the Shepard promotion). But if plaintiff's claimed expenses for 1978 are accurate, his claimed expenses for 1979 are obviously overstated. As I observed in my earlier opinion, Mr. Cowan virtually ceased work in July 1979, when he failed to receive the promotion that was given to Arthur Lely. Because Mr. Cowan essentially stopped selling policies and collecting premiums at that time, I find it difficult to believe that his expenses in 1979 could have exceeded his expenses for the previous year. Mr. Cowan's out-of-pocket expenses would have thus increased had he been promoted to sales manager. Accordingly, I conclude that Mr. Cowan is not entitled to an award for backpay.

## II. DAMAGES FOR EMOTIONAL DISTRESS

■ Although my earlier opinion addressed specifically only plaintiff's claim under Title VII, plaintiff had also alleged a claim under 42 U.S.C. § 1981, which provides that "all persons ... shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." Section 1981 has been interpreted to forbid racial discrimination in private employment, *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975), and although differences exist between Title VII and Section 1981 in coverage, procedure and remedies, under the circumstances of this case a finding of unlawful discrimination under Title VII compels a similar finding under Section 1981. *See, e.g., Gray v. Board of Higher Educ.*, 692 F.2d 901, 905 & n. 8 (2d Cir.1982); *Lewis v. University of Pittsburgh*, 725 F.2d 910, 915 & n. 5 (3d Cir.1983). Unlike Section 1981, however, Title VII makes no

provision for legal remedies such as the award of compensatory damages, *see, e.g., Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1184 (7th Cir.1986); *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 138–39 (3d Cir.1986); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1363–64 (11th Cir. 1982), including damages "for emotional distress, pain and suffering, or interest that would have been earned on ... lost wages." *Protos*, 797 F.2d at 138. Accordingly, plaintiff's claim of damages for emotional distress will be treated as arising under Section 1981.

■ At the hearing on damages, Mr. Cowan testified that he had been deeply affected by Prudential's failure to give him the promotion that went to Arthur Lely in August 1979. Mr. Cowan stated that "I [had] wanted to climb as high as I possibly could" at Prudential, but that when he was denied the Lely promotion "I felt humiliated, I felt—I had a very low self-esteem...." According to Mr. Cowan, every time a sales manager's position was about to open up, he would tell his clients that he would no longer be collecting premiums. When he did not get the promotion, he would then feel humiliated in front of his clients when he continued to collect premiums. Mr. Cowan further testified that after the Lely promotion he became involved in an altercation with Mr. Lely, and that "the other agents in the office stopped talking to me and those that did talk to me, talked down to me."

Mr. Cowan's relationship with his wife deteriorated as well. When he complained to her that he was the victim of racial discrimination, she disagreed,[4] leading to much tension and many arguments between them. After the Lely promotion, Mr. Cowan began to drink heavily. He behaved erratically and, according to Mrs. Cowan, at times "would stay out all night." After one such episode, Mrs. Cowan "threw all his clothes down the stairs and out the front door" and asked Mr. Cowan to leave. Mrs. Cowan testified that she "felt that he needed some help and there

---

4. The evidence is clear that Mrs. Cowan disputed his claims of discrimination. The transcript of the hearing on damages appears to be incorrect at p. 50, line 8. There should be a "not" at the end of the line.

wasn't anything I could do about it. It wasn't like I could sit and talk to him. He was incoherent. He didn't hear you when you talked to him." The Cowans both testified that Mr. Cowan did not seek professional counseling because he feared that, in light of his history of drug abuse, he might be labeled as unemployable or unpromotable.

Although there was substantial testimony about Mr. Cowan's extensive emotional damages, there are nonetheless factors weighing against an award of $50,000—$150,000 for emotional injury. Mr. Cowan was never subjected to overt racism or public humiliation. There were no racial epithets or public acts of discrimination. As my earlier opinion indicated, Mr. Amatrudo's failure to consider him for promotion—the sole basis for liability—was disclosed only at trial. Although I believe that Mr. Cowan was probably better qualified than those promoted ahead of him, the differences in qualifications were so small that they would not support an inference of discrimination. *See generally Cowan I* at 192–196 (Appendix A).

Moreover, as I observed in my earlier opinion, Mr. Amatrudo had not made his failure to consider Mr. Cowan known to his superiors at Prudential. To the contrary, he led them to believe Mr. Cowan was promotable. Prudential thus offered Mr. Cowan at least three other sales manager positions, in Norwich, Bridgeport and Boston. These offers were made in good faith by Prudential and did not involve positions so inferior to one in Stamford as to insult or humiliate Mr. Cowan in any way. The positions offered involved rural and urban settings and diversity in the race of potential clientele. Mr. Cowan testified that each involved a district far less successful in terms of volume of business than Stamford. The latter's apparent success was due largely to the performance of Mr. Vitanza's staff, however. Had Mr. Cowan been promoted, the staffs that would have gone to Mr. Cowan were not particularly successful. Moreover, the Stamford district was in decline. I thus must conclude that these offers clearly exclude any harm from public humiliation.

I also believe Mr. Cowan may not recover for the humiliation he claims resulted from his alleged predictions to his clients that he would be promoted. If such predictions were made (I make no finding on whether they were), they were flatly inconsistent with his simultaneous arguments with his wife about whether he was the victim of racial discrimination. If he believed, as he clearly did, that he was the victim of racial discrimination, he should not have predicted imminent promotion to others and thus increase his humiliation by his own acts. Mr. Cowan also cannot recover for the emotional distress resulting from his problems with his co-workers. As I observed in my earlier discussion of Mr. Cowan's constructive discharge claim, these problems were not due to racial animus. "The evidence is overwhelming that Mr. Czel and Mr. Lely were reacting to being described publicly by Mr. Cowan [in a newspaper article] as not deserving promotion...." *Id.* at 191.

Finally, I conclude that Mr. Cowan should have sought counseling. His belief that he would be hindered in his employment prospects if he received counseling is not credible, for his conduct in refusing to work at Prudential and his subsequent poor performance at Metropolitan Life were potentially far more damaging to his career than public knowledge of counseling would have been. Moreover, he had no reason at all to anticipate that the counseling would not be confidential.

For the foregoing reasons, I conclude that Mr. Cowan is entitled to an award of $15,000 for his emotional distress.

## III. CONCLUSION

Plaintiff has failed to prove that he is entitled to an award for backpay under Title VII because the evidence demonstrates that, had he obtained the promotion that he was unlawfully denied, he would have earned less than he could have in his original job. Nevertheless, plaintiff has proven that he has suffered emotional distress as the result of defendant's discrimination, and is accordingly awarded $15,000

in damages under Section 1981. This opinion will serve as my findings of fact and conclusion of law under Fed.R.Civ.P. 52. SO ORDERED.