**Julie E. PACKARD–KNUTSON, Plaintiff,**

v.

**MUTUAL LIFE INSURANCE COMPANY OF NEW YORK and John O'Connor, Defendants.**

**No. 2C 84–3004.**

United States District Court, N.D. Iowa, C.D.

July 6, 1987.

Blake Parker, Fort Dodge, Iowa, for plaintiff.

Brent B. Green, Karen J. Lamp, Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION AND ORDER

DONALD E. O'BRIEN, Chief Judge.

This matter is before the Court following trial, presentation of all evidence and testimony, and the arguments of counsel. This is a sex discrimination in employment case, brought pursuant to Title VII (42 U.S.C. § 2000e et seq.). Plaintiff also alleges a pendent state claim of wrongful discharge. After careful consideration of all the evidence and arguments, the Court finds for the plaintiff on her Title VII claim. For the reasons set out in detail below, the Court dismisses plaintiff's state claim of wrongful discharge and dismisses John O'Connor in his personal capacity and MONY Central Iowa Associates as defendants.

## FINDINGS OF FACT

1. This Court has jurisdiction pursuant to 42 U.S.C. § 2000e and 28 U.S.C. §§ 1343 and 1331.

2. Plaintiff is an employee under Title VII. The Court incorporates here by reference its earlier order finding that plaintiff was indeed an employee for the purposes of Title VII and not an independent contractor as alleged by defendants.

3. Plaintiff, Julie Packard-Knutson, became a field underwriter for the sale of insurance with Defendant Mutual Life Insurance Company of New York (hereinafter MONY). Plaintiff began working for

MONY pursuant to a written contract dated June 18, 1979 with an effective date of July 16, 1979. (Exhibit A).

4. Plaintiff was recruited by her brother-in-law, Sam Johnson, who was sales manager for MONY in the Fort Dodge office.

5. MONY's Fort Dodge office was a satellite office of its Des Moines, Iowa agency during all times relevant to this lawsuit.

6. At the time plaintiff was hired, Sam Johnson was the agency manager, with James Dwyer as the agency manager for the main office in Des Moines, Iowa.

7. Defendant John O'Connor replaced James Dwyer as manager of the Des Moines agency inearly 1981. Several women agents were working at the time he replaced Dwyer. However, at the time of trial, only one woman remained at the Des Moines office. Prior to becoming agency manager in Des Moines, O'Connor manages MONY's agency in Columbia, South Carolina. He stated he had employed one female underwriter in South Carolina, but that he ultimately let her go because she didn't work out. Defendant O'Connor was plaintiff's supervisor until he terminated her field underwriter contract.

8. During the time plaintiff was a MONY field underwriter, the MONY agency based in Des Moines, Iowa was informally identified by MONY as MONY Central Iowa Associates. Although MONY Central Iowa Associates was named as a party defendant in this action, the Court finds that MONY Central Iowa Associates is merely the name used by MONY to identify its Des Moines, Iowa office and the geographical region which it serves. It is an agency of the insurance company MONY and is not a separate, independent corporation or other business entity.

9. Plaintiff made her first sale in the form of a restaurant association plan during her fifth week of employment.

10. MONY underwrites a group insurance program for veterinarians administered by the American Veterinary Medical Association (AVMA). As part of that program, MONY field underwriters solicit veterinary students at Iowa State University in the spring of each year.

11. The AVMA solicitation is considered a "plum" by other MONY field underwriters, because it is generally a lucrative group market solicitation in which substantial sales commissions can be earned within a short time.

12. Plaintiff was allowed to participate in the AVMA solicitation each year she was with MONY until 1983, when Defendant O'Connor informed her that she would no longer be permitted to participate in the AVMA solicitation.

13. MONY maintains "honor clubs" for its field underwriters, which are benchmarks of written production. MONY utilized the following honor clubs during the plaintiff's employment: Field Club, Step up to Top Club, Top Club, President's Council and Top Fifty. Plaintiff did not qualify for any honor clubs her first year with MONY. However, for the years 1980, 1981 and 1982, she made Step Up to Top Club (the precursor to Top Club) twice and Field Club once. (Exhibit 3). In 1980, she was the only underwriter from the Fort Dodge office to qualify for an honor club. (Exhibit 3). Plaintiff's total yearly income from MONY as shown by her wage and tax statements (Exhibit M) were as follows: 1979—$6,802.23; 1980—$27,889.44; 1981—$19,237.39; 1982—$15,273.74; 1983—$1,921.96. Her commission income for each year was as follows: (Exhibit 34) 1979—$3,251.93; 1980—$19,368.00; 1981—$11,782.52; 1982—$10,505.73. As Exhibit 34 was prepared in December 1982, it does not include any commission income earned in 1983.

14. Beginning in late December 1981, plaintiff did not work for six weeks because she underwent surgery to correct an infertility problem. (Exhibit 22).

15. During the last week of January 1982, plaintiff announced that she was pregnant. Plaintiff had a closely monitored pregnancy. Her child was born on September 11, 1982. Plaintiff had made prior arrangements with John O'Connor that when her child was born, she would

take a child-rearing leave until January 1, 1983.

16. MONY field underwriters were required to submit goals for each year. In December 1980, plaintiff completed her goals statement for the coming year 1981. (Exhibit B). This statement expresses a good attitude and willingness to work. In December 1981, plaintiff prepared her goals statement for 1982. (Exhibit B-1). Again, plaintiff expressed an intention to increase her production and her desire to become a sales manager. However, at the time plaintiff completed this form, she did not know she would be pregnant in 1982. Further, once she found out she was pregnant, she withdrew her request to become sales manager. In January 1983, plaintiff submitted her goals for that year. Her production goals did not differ substantially from her 1982 goals. However, she did express frustration with her supervisor, John O'Connor, in her written comments.

17. Following the birth of her baby, plaintiff took her infant to the office with her for half days for approximately one month during the latter part of 1982. On December 3, 1982, plaintiff was in the Fort Dodge office with her baby. A meeting was scheduled between her and O'Connor to discuss her return to work and the AVMA convention in Chicago.

18. At this meeting, O'Connor informed plaintiff that based on commissions, he would have to offer the Chicago AVMA trip to another agent, Jim Tappe. O'Connor explained that the AVMA would only pay for one agent's travel, but that plaintiff could still attend the convention if she made other arrangements. O'Connor informed plaintiff that she needed to generate more first year commissions, and plaintiff stated that when she returned full-time, she intended to do quality business which might take longer to generate. O'Connor and plaintiff did not discuss her goals for 1983, as plaintiff had not yet completed her goals statement for that year.

19. After the meeting, plaintiff returned to her office and began to breast feed her baby with the door shut. O'Con-

nor walked in, saw what she was doing, and shut the door. Plaintiff called after him that it was okay. Later, plaintiff went into the conference room and discussed the incident with O'Connor, attempting to joke about it.

20. Sharon Looshen was a field underwriter in the Des Moines office in December 1982. She testified that O'Connor told her at the copy machine in the Des Moines office that plaintiff had been nursing her baby at the Fort Dodge office. Looshen further testified that O'Connor's demeanor was puzzled and shocked, amd he asked Looshen, "can you imagine that?"

21. On December 7, 1982, plaintiff wrote O'Connor a letter, stating that it had been good to see him at the December 3d meeting and that she was looking forward to returning to work full-time. (Exhibit 36). She also asked to be informed whether Jim Tappe intended to attend the AVMA convention in Chicago so that she would be able to make her own arrangements should he decide to attend. Plaintiff further stated she believed it was important for her to attend the convention in order to learn of the changes in the AVMA program.

22. On December 7, 1982, O'Connor wrote to plaintiff, stating that after their meeting on Friday, December 3d, "it became evident that your intentions to return to full-time production after January 1, 1983, is wishful thinking and not very practical." (Exhibit 31). O'Connor also informed plaintiff that he had decided to have Bill Sheridan work the AVMA enrollment at Iowa State instead of plaintiff. For this reason, O'Connor stated, Bill Sheridan would need to attend the AVMA convention in Chicago.

23. On December 14, 1982, plaintiff wrote to O'Connor, responding to his letter of December 7, 1982. Plaintiff stated that she could not accept his decision removing her from the AVMA solicitation as his statement that her returning to full-time work was wishful thinking did not make sense as she had not even returned full-time as yet and was only due to do so in January of 1983. Plaintiff also pointed out that in 1982, she had had her best year

ever in the AVMA solicitation program and reminded O'Connor that he had congratulated her on receiving the largest group commission check ever mailed out of the agency. Plaintiff also stated she believed that the only thing that had changed was the fact that she had had a baby and called O'Connor's actions discriminatory.

24. On December 20, 1982, O'Connor wrote to plaintiff, responding to her December 14th letter. (Exhibit 34). He explained that her production was low and that that was the reason he removed her from the AVMA program. He also stated, "If you return to work on a full-time basis in 1983 and produce at the level you are capable of, I may consider you for the 1984 spring solicitation at Ames."

25. On January 4, 1983, O'Connor wrote plaintiff a letter, sending her a copy of a MONY goals form for 1983, and requested her to have this form completed when they met on Friday. (Exhibit 19). O'Connor testified that this letter was sent by mistake. He stated that his regional report was due in November 1982 and that plaintiff had given him her goals at the December 3, 1982 meeting. However, plaintiff's testimony contradicts this, as she stated that they did not discuss her goals at the December 3d meeting, and that she had not even completed the goals form as of December 3. O'Connor admitted that he did not look at the goals form he claimed he received on December 3, but merely dropped them into his briefcase. Having considered plaintiff's and O'Connor's testimony and the January 4, 1983 letter (Exhibit 19), the Court concludes that O'Connor's recollection of events is erroneous, and that plaintiff's goals for 1983 were not submitted until after January 4, 1983.

26. Plaintiff turned in her goals statement after January 4, 1983. (Exhibit C). It contained negative comments about O'Connor's management techniques. Plaintiff and O'Connor met on January 7, 1983 to discuss her goals for 1983 and her attitude, but nothing further was said about the AVMA program or the possibility of termination.

27. On January 26, 1983, plaintiff wrote to a Mr. Rosenberg of MONY, alleging that John O'Connor had discriminated against her due to her sex. (Exhibit 13).

28. O'Connor did not see this letter, but learned that plaintiff had written it from Bill Sheridan, another underwriter at the Fort Dodge office. Within two weeks of plaintiff's letter to Rosenberg, O'Connor terminated her in a letter dated February 14, 1983. (Exhibit 32). This letter stated that her termination was effective on March 16, 1983.

29. Plaintiff instead terminated her employment with MONY on February 15, 1983. She was unemployed from February 15, 1983 until the end of May 1983, when she began working for Paine-Weber/Shearson as a stock broker. Plaintiff worked for Paine-Weber/Shearson from 1983 to 1984 and earned $26,562.81. She began working at Bankers Life in 1985 and earned $14,464.62. Plaintiff testified at trial that she would make $30,000.00 to $40,000.00 in 1986.

30. The Court finds that Defendant O'Connor, in his official capacity for Defendant MONY, discriminated against the plaintiff on the basis of her sex.

## CONCLUSIONS OF LAW

A. Discrimination.

■ As a preliminary matter, the Court notes that although MONY Central Iowa Associates is named as a party defendant, the evidence demonstrates that MONY Central Iowa Associates is merely the name used by MONY to identify the MONY Des Moines, Iowa office and the surrounding geographical region which it serves. It is an agency of MONY and is not a separate, independent corporation. Therefore, the Court dismisses MONY Central Iowa Associates as a defendant. The Court also finds that Defendant John O'Connor's actions were taken on behalf of Defendant MONY. Therefore, the Court finds that Defendant O'Connor is not liable in his personal capacity, but only in his official capacity as the manager for MONY.

■ *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), sets forth the requirements for a prima facie case under Title VII. A plaintiff may establish a prima facie case of discrimination by showing:

(i) that she belongs to a racial minority;

(ii) that she applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite her qualifications, she was rejected; and

(iv) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* While that case involved allegations of racial discrimination, the Supreme Court has held that the *McDonnell-Douglas* prima facie case is flexible, and can be altered somewhat depending upon the type of case. *Furnco Construction Co. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978). A prima facie case of sex discrimination thus contains the following elements: (1) Plaintiff was within a protected class, i.e., pregnancy; (2) she was qualified for the position; (3) she was discharged; and (4) she was replaced by another whose qualifications were comparable to the plaintiff's. The burden of establishing a prima facie case is not an onerous one. *Bell v. Bolger,* 708 F.2d 1312, 1317 (8th Cir.1983), *citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The Court finds that in the case at bar, plaintiff is a member of a protected class, and that she was capable of performing the job. Plaintiff was discharged, and other agents hired who had qualifications comparable to plaintiffs. Thus, the Court finds that the plaintiff has established a prima facie case.

■ Once plaintiff has demonstrated a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Coleman v. Missouri Pacific Railroad Co.,* 622 F.2d 408, 410 (8th Cir.1980). Once this is done, the plaintiff has the opportunity to show that the employer's articulated reason is merely a pretext for what was really illegal discrimination. *Id.*

In the instant case, defendant asserted inadequate performance and scornful attitude towards management as its legitimate, nondiscriminatory reason for firing plaintiff. Defendant argues that the plaintiff's sales production steadily decreased to the point where she had to be terminated for lack of production.

However, the Court finds that plaintiff has met her burden of proving that these reasons were pretextual. Exhibit 16 demonstrates that while her life and health sales did decrease in 1982, her group sales and her renewals were on the rise. In December 1981, plaintiff underwent surgery to correct an infertility problem and became pregnant in early 1982. She worked only six and a half months during 1982 because of her surgery and maternity leave. Had plaintiff actually worked a full twelve months in 1982, the Court finds that it is extremely probable, based on Exhibit 16, that she would have met or exceeded her life and health sales made in 1981. Also, plaintiff qualified for honor clubs in all but her first year with MONY, and in 1980, was the only field underwriter from the Fort Dodge office to qualify for an honor club.

The Court also finds that defendant's reasons were pretextual because another Fort Dodge employee, Michael Fitzharris, wrote no new business from October 1982 until July 1983 and was not immediately terminated. Even when he was discharged, he was permitted to continue to do service work on MONY products.

It was not until after the birth of plaintiff's baby that defendant began to complain of her alleged lack of production. The evidence demonstrated that John O'Connor informed plaintiff during their December 3, 1982 meeting that she needed to generate more first-year commissions. Nor did plaintiff's attitude change until after O'Connor's December 7, 1982 letter where he stated that plaintiff's intentions of returning to full-time work in January 1983 were wishful thinking. Defendant's

position is that plaintiff's goals statement which she allegedly gave to the defendant on December 3, 1982 demonstrates her scornful attitude toward management and is one of the reasons she was fired. However, plaintiff had been on maternity leave since September, and there is no evidence that she did not intend to return to full-time sales in January 1983. When plaintiff completed her goals statement which the Court finds she did after January 1983, she had already been told that her return to full-time work was "wishful thinking," and the Court finds that this was a cause of her change in attitude as reflected on her 1983 goals statement.

O'Connor fired plaintiff within two weeks of her letters to upper level MONY management, complaining of sex discrimination. (Exhibits 13 and 35). Defendant objected to the introduction of these letters, arguing that they were hearsay. The Court overrules defendant's objection. While the letters are out-of-court statements, they were not offered (nor has the Court considered them) to prove the truth of the matters asserted. The Court has considered these letters only to demonstrate that upper level MONY management were aware of the plaintiff's allegations and that John O'Connor knew that the letters had been sent. Thus, based on the evidence and testimony presented in this case, the Court finds that plaintiff was discriminated against on the basis of her sex and is entitled to damages. As the Court finds for the plaintiff on her Title VII claim, it is not necessary to address plaintiffs' pendant state claim for wrongful discharge.

### B. Damages.

Plaintiff called Tony Schrader as her expert witness on damages. Mr. Schrader has worked for the Iowa Department of Insurance since 1972 and stated that he was familiar with the various types of compensation for insurance agents. The Court permitted defendant to voir dire Mr. Schrader for the purpose of making an objection. During the voir dire, Mr. Schrader admitted that he "[knew] only a little bit of what she's [plaintiff] making right now." He further stated that he would not testify as to mitigation and would use only gross figures without reducing them to present value. Following voir dire, defendant objected to Mr. Schrader's opinion regarding damages based on the above statements. The Court overruled defendant's objection, holding that it went to the weight of Mr. Schrader's testimony, not to its admissibility.

After carefully reviewing the exhibits and Mr. Schrader's testimony, the Court finds that his damage calculations are entitled to little weight. The Court appreciates the work and time Mr. Schrader expended in preparing for this presentation. However, his calculations are of little use, as they were based on an improper measure of damages. Exhibits 43, 44, 47, 48 and 49 demonstrate that Mr. Schrader calculated plaintiff's damages based on what he believed she would have earned had she remained with MONY until her 60s. However, as the discussion below shows, this is not the proper damages formula for a Title VII case.

The purpose of Title VII damages is to make persons whole for injuries suffered because of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). One of the most common Title VII remedies besides reinstatement is back pay.[1] Back pay is measured from the date of discharge to the date of entry of judgment. *EEOC v. Monarch Machine Tool Co.*, 737 F.2d 1444, 1452–53 (6th Cir.1980); *Wangsness v. Watertown School Dist.*, 541 F.Supp. 332, 341 (D.S.D.1982). This amount is then reduced by any interim earnings received during that period, regardless of whether the interim earnings were from a lower paying job. *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1275 (4th Cir.1985); *EEOC*

---

**1.** Plaintiff admits in her proposed Findings of Fact and Conclusions of Law that reinstatement is not feasible, as she is currently working for a competing life insurance company and has no desire to change jobs. Therefore, the Court will not consider reinstatement as a remedy.

*v. Monarch Machine Tool Co., supra,* 737 F.2d at 1450; *Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1168 (5th Cir.1980). Thus, plaintiff's back pay period commenced on February 16, 1983 and ends on the date this Court enters judgment. This amount must be reduced by the $26,562.81 plaintiff earned at Paine-Weber/Shearson from 1983 to 1984 and by the $14,464.62 she earned at Bankers Life in 1985. Plaintiff's back pay award must also be reduced by the amounts she has earned at Bankers Life from 1986 to the day of entry of judgment.

■ The Court is unable to compute the total damages figure. First, the Court is unable to rely on the average income computed by Mr. Schrader. He included "efficiency income" in his average income calculations. Efficiency income is a bonus paid to a MONY agent for the fifth year a policy remains on the books. However, plaintiff herself testified that she never earned any efficiency income. Therefore, the Court finds that efficiency income should not be included in any back pay calculation.

Mr. Schrader also included renewal commissions in his calculations. The parties took the deposition of David Frances, Assistant Vice President of Agency Operations for MONY. The parties agreed that this deposition would be submitted in lieu of Mr. Frances' live testimony at trial. He testified that he served on the committee which developed the Lifetime Plan Contract for MONY underwriters. Mr. Frances further stated that while plaintiff was hired under a Lifetime Plan Contract, she was also under a Career Incentive Plan Supplement to her Lifetime Plan Contract. He explained that the Career Incentive Plan Supplement is a training allowance plan to assist new agents in supplementing their early years in income. Exhibit A is a copy of plaintiff's Lifetime Plan Contract. Plaintiff's Career Incentive Plan Supplement begins on page 5 of Exhibit A. Section 6 of the Supplement is entitled "Commissions After Termination" and states as follows:

After termination of his Career Incentive Plan—II Supplement and Lifetime Plan Contract, no first year or renewal commissions whether vested or nonvested will be payable to the field underwriter on any business produced while the supplement was in force.

The first page of the Supplement (Exhibit A, p. 5) provides as follows:

It is agreed that your Lifetime Plan Contract and Supplements to it are modified to provide for payment of Training Allowances in accordance with and subject to the terms of the Career Incentive Plan for new MONY career Field Underwriters, a copy of which is attached hereto and made a part hereof. Such Contract and Supplement are further modified to provide that after termination of your continuing service under the Lifetime Plan Contract no first year or renewal commissions, whether vested or nonvested, will be payable on business produced by you while this Supplement is in force.... This Supplement will terminate automatically three years from the effective date shown above. This Supplement may be terminated by you or by MONY at any time before the expiration of three years, upon notice to the other party.

Thus, as the Supplement was in effect throughout plaintiff's tenure with MONY, Mr. Frances stated that plaintiff would not be entitled to efficiency or renewal income upon her termination. The Court has examined the Career Incentive Plan Supplement to the Lifetime Plan Contract and finds that, as the Supplement was in effect when plaintiff's Lifetime Plan Contract was terminated, she is not entitled to efficiency or renewal income on business she wrote before her termination during her back pay period.

■ The Court concludes that plaintiff is entitled to back pay from the date of her unlawful discharge to the date of entry of judgment by this Court less plaintiff's interim earnings. However, the plaintiff is not entitled to efficiency or renewal income. The parties are directed to determine the amount of the back pay award in

conformance with this opinion. In the event the parties are unable to determine the amount of back pay due within thirty days from this date, the Court will hear and decide the issue as to amount. The Court further finds that plaintiff would not be made whole without prejudgment interest on her back pay award and directs the parties to include this in their back pay calculation. *Behlar v. Smith,* 719 F.2d 950, 954 (8th Cir.1983).

Plaintiff has also prayed for punitive damages and damages for mental and emotional distress. However, such damages are unavailable in a Title VII action. *Muldrew v. Anheuser-Busch, Inc.,* 728 F.2d 989, 992 n. 2 (8th Cir.1984); *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363–64 (11th Cir.1982). Therefore, the Court must deny plaintiff's claim for punitive damages and for damages for mental and emotional distress.

IT IS THEREFORE ORDERED that the Court finds that the defendant discriminated against the plaintiff on the basis of her sex.

IT IS FURTHER ORDERED that Defendant John O'Connor in his personal capacity and Defendant MONY Central Iowa Associates are hereby dismissed as defendants in this case.

IT IS FURTHER ORDERED that plaintiff's pendent state claim for wrongful discharge is hereby dismissed.

IT IS FURTHER ORDERED that the parties shall determine the back pay amount due within thirty days from the date of this order. Back pay shall commence as of February 16, 1983 and shall close as of the date of this order, so that counsel may have a date to utilize in computing the back pay award.

IT IS FURTHER ORDERED that in the event the parties are unable to determine the amount of back pay due within thirty days from the date of this order, the Court will hear and decide the issue as to amount, and will then direct the Clerk to enter judgment.

IT IS FURTHER ORDERED that plaintiff's claim for damages for mental and emotional distress is hereby denied.

IT IS FURTHER ORDERED that the Court does not intend this order to be final for the purposes of appeal.